# **Exhibit 1**

Transcript of Proceedings
March 14, 2024

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

_____

SHAWN MCBREAIRTY,

        Plaintiff,               CIVIL ACTION NUMBER:

        -vs-                   1:24-cv-00053-LEW

BREWER SCHOOL DEPARTMENT, et al.,    Motion Hearing

        Defendants.
_____

        Margaret Chase Smith United States Courthouse
        202 Harlow Street
        Bangor, Maine 04401
        March 14, 2024

**B E F O R E**:        THE HONORABLE LANCE E. WALKER
                    UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**:

RANDAZZA LEGAL GROUP PLLC
BY:  MARC RANDAZZA, ESQUIRE
On behalf of the Plaintiff.

DRUMMOND WOODSUM & MACMAHON
BY:  MELISSA A. HEWEY, ESQUIRE
     and
     JEANA M. MCCORMICK, ESQUIRE
On behalf of the Defendants, Brewer School Department, et al.

PETRUCCELLI MARTIN & HADDOW LLP
BY:  JAMES B. HADDOW, ESQUIRE
On behalf of the Defendant, Michelle MacDonald.

        Cathy J. Ford, Official Court Reporter
             cfordccr@gmail.com
             609.367.2777

Proceedings recorded by manual stenography; transcript
produced by computer-aided transcription.

```
 1              THE DEPUTY COURT CLERK:  All rise.

 2              The United States District Court is now in session.

 3    The Honorable Lance Walker, presiding.

 4              (Open court begins at 9:58 a.m.)

 5              THE COURT:  Good morning, folks.  Have a seat.

 6              We're on the record in Shawn McBreairty versus the

 7    Brewer School Department.  This is Civil Case Number

 8    24-cv-53-LEW.

 9              I'll have counsel introduce themselves, please, for

10    the record.

11              MR. RANDAZZA:  Good morning, your Honor.

12              THE COURT:  Good morning.

13              MR. RANDAZZA:  Marc Randazza on behalf of Shawn

14    McBreairty and H.W.  With me is my paralegal, Cassidy Flavin.

15              THE COURT:  Good morning, folks.

16              MS. HEWEY:  Good morning, your Honor.  Melissa Hewey

17    and Jeana McCormick on behalf of the Brewer School Department,

18    Gregg Palmer, and Brent Slowikowski.

19              THE COURT:  Great.  Good morning.

20              MR. HADDOW:  And, your Honor, James Haddow for the

21    defendant Michelle MacDonald.

22              THE COURT:  Good morning.

23              MR. HADDOW:  Good morning, your Honor.

24              THE COURT:  All right.  Let's start with the

25    McBreairty case, Mr. Randazza, and I'll hear from you.
```

```
 1            MR. RANDAZZA:  Thank you, your Honor.  Do you prefer
 2     from the table or the podium?
 3            THE COURT:  Why don't you come up to the podium
 4     unless you need to be at the table for a reason.
 5            MR. RANDAZZA:  Good morning, your Honor.
 6            THE COURT:  Good morning.
 7            MR. RANDAZZA:  I'm happy we're starting with the
 8     McBreairty case because I think that is the easier decision
 9     here.
10            I believe what we have here is, first, there's some
11     question about standing, about whether there was a sufficient
12     threat made that a reasonable person might succumb to that
13     threat in sense of themselves.
14            My friend -- and I use that term not just
15     colloquially but truly -- Ms. Hewey has raised the -- has
16     raised the defense here that it really wasn't that specific,
17     and it's not specific enough for a pre-enforcement challenge.
18            But I think what my friend gets wrong is that her
19     citation to pre-enforcement challenge cases, all of them talk
20     about -- all of those cases talk about when there's a rule
21     passed and then somebody feels that that rule might be
22     enforced against them, not a circumstance where there's
23     actually a direct and palpable government threat of
24     enforcement or other action.
25            Now, it is true, if you look at that threat, it
```

 1    doesn't specifically say what they're going to do.  It's just

 2    a letter from a lawyer that says, "We are going to take

 3    further action against you."

 4            Brewer School Department then says, "Well, that might

 5    have simply meant that we would write our own editorial about

 6    you."

 7            That's simply not credible.  You know, if you look at

 8    it and you want to say this is too vague to interpret as a

 9    threat, well, why isn't it vague enough to interpret as,

10    though, they'll burn down his house?

11            I think if you look at the extremes of absurdity, on

12    one end it's we're going to do something violent to you, and

13    on the other end, we're not really going to do anything except

14    send you another sternly worded letter.

15            Mr. McBreairty received a legal threat.  But not only

16    did -- I think in itself it creates enough standing.  But

17    contextually, given the relationship he has with the

18    government on these issues, we showed you in our papers,

19    prior, he was threatened similarly.

20            He did what he was told because he was afraid of

21    getting sued, and he didn't get sued.  The next time, he did.

22    This time, he's coming to this Court seeking your assistance.

23            THE COURT:  Let me ask you a question about the --

24    your challenging some of the cases, or many of the cases that

25    you've cited in your papers rely on plaintiff's challenging

1  the constitutionality of a criminal statute that may infringe

2  the First Amendment.  So how do the principles of standing

3  work in this admittedly different context?

4          MR. RANDAZZA:  I think the absence of a statute that

5  they're saying -- first of all, there isn't an absence of the

6  statute.  They are actually threatening in that letter to try

7  to enforce these -- I'll just call them the alphabet policies

8  because I can't remember the exact acronyms off the top of my

9  head.  But the alphabet policies here, which normally we might

10  look at and say that's just crazy, why would they ever try to

11  do that?

12          THE COURT:  Right.

13          MR. RANDAZZA:  Well, they have.  We're defending that

14  right now.  We're up in front of the Maine Supreme Court as

15  far as whether they can do that or not.

16          So this is not an ephemeral or simply, you know,

17  imaginary concern.  This particular person in this particular

18  context with this particular kind of action that has been

19  threatened here, he is under that.

20          So if it were a case of -- I understand that they're

21  arguing, well, what statute are we challenging?

22          Well, we're not challenging necessarily a statute.

23  We're challenging the government threat.

24          If the police showed up at my house and said they're

25  going to arrest me for nothing, I don't then say, "Well, I

1  guess I can't go to federal court over this because they

2  haven't actually cited a statute."

3        Here, we have both.  They're saying that because he

4  somehow violated this privacy law, they're going to do

5  something to him.  And it's something less than violently

6  attack him but certainly something more than simply voice

7  their displeasure.  It is government action that's going to be

8  threatened here.

9        So he has a right to prove punishment, seek redress

10  from the courts.  I don't think he has to simply wait to be

11  sued or wait to be -- I don't know what else.  But if we look

12  at the circle of probabilities of what that threat is supposed

13  to mean.

14        And perhaps it was just an empty threat.  Perhaps

15  they just hoped they could bully him into silence.  Well, that

16  would still be adverse government action even in the absence

17  of a criminal statute, but he could be violated.

18        But they did invoke the privacy statute, saying that

19  this may be in violation of that law, which I can certainly

20  address that if it's --

21        THE COURT:  The privacy statute invokes school

22  policies, which I'd like to ask you about as well.

23        MR. RANDAZZA:  Yeah.

24        THE COURT:  But as a thought experiment, I'm

25  wondering if you might be able to answer whether it would be

1  enough to satisfy standing if there was a relatively vague

2  allusion to further action if you don't do or demanding that

3  you do, we'll be compelled to take further action.

4        Is sort of a vague allusion, indefinite reference to,

5  presumably, civil litigation enough to grant your client

6  standing in that context?

7        MR. RANDAZZA:  Yes.  If that was all the threat was,

8  if we had all the other context gone, I would still say it is

9  sufficient.

10        If the government says, "Stop it or else" --

11        THE COURT:  Yeah.

12        MR. RANDAZZA:  -- I don't know that we need to have

13  a -- otherwise, what is -- what does the "or else" mean?  As

14  we said, if the school bully says, "Give me your lunch money

15  or else," do you ask, "Or else what?"

16        Well, you ask, "Or else what?" if you're not scared.

17        You're about my age.  You've been in a bar at some

18  point where somebody said something.  And you say, "Or else

19  what?" if you're not afraid.  This guy's afraid.  That's why

20  he censored himself.

21        THE COURT:  And what does the historical relationship

22  between Mr. McBreairty and Ms. Hewey and Ms. Hewey's law firm

23  add to the analysis, if anything?

24        MR. RANDAZZA:  I think it adds credibility to it.  So

25  if, you know, it -- imagine if, you know, you had somebody who

1    has the typical enforcer for some crime family shows up.

2         I mean, I'm sorry.  That's probably an unflattering

3    comparison.

4         THE COURT:  I think Ms. Hewey thought it might be.

5         MR. RANDAZZA:  I do apologize.

6         But I'll say when you have had this same weapon,

7    we'll say, brandished against you and used against you --

8    brandished in 2021, actually used and drawn blood in 2022, in

9    2023, 2024 -- I think you have a very real reason to be afraid

10   that you're going to wind up in another *Hermon* suit or

11   something else.

12        I mean, the *Hermon* suit is quite creative.  I do not

13   know the limits of Ms. Hewey's creativity.  I certainly have

14   respect for them, and Mr. McBreairty does as well.

15        So to say that even in a vacuum but contextually, I

16   think we have a looming threat here of adverse government

17   action that he should not have to sit and wait until it hits

18   him to come here seeking redress.

19        THE COURT:  In the absence of a letter, if we take

20   that out of the equation, does the -- or maybe not in its

21   totality.

22        But if we just narrowed our focus as to the

23   suggestion by the school that Mr. McBreairty was somehow in

24   violation of those policies that were referenced by Ms. Hewey,

25   how do you -- how does that affect the analysis?

1      MR. RANDAZZA:  That hypothetical, I think, would

2  change my beliefs about standing.  If simply the principal

3  called up and said, "Hey, Mr. McBreairty, I think you're

4  violating the school policies," that would be a closer call.

5      THE COURT:  Okay.

6      MR. RANDAZZA:  I think if he said, "You're violating

7  these school policies and we're going to call in Drummond

8  Woodsum," then I think we've tipped over into state -- into

9  clear standing grounds.

10     But I think even so, when the government calls you

11  and says you're violating a government policy or a statute, I

12  think you right then, immediately, have standing.

13     Now, I think if -- I think if we tilt the

14  hypothetical a little more and say, "What if the principal had

15  written an editorial about it?" I think then I wouldn't be

16  able to credibly claim standing.  I think then it would be

17  just some vague allusion.

18     THE COURT:  All right.

19     MR. RANDAZZA:  But this is a direct threat.

20     And also, remember, it has this -- I pointed out some

21  cases that talked about the immediacy and persistence.

22     So respond, "You better tell us you did this.  Not

23  just give us your position.  You better tell us you complied

24  within 24 hours.  You got 24 hours to comply."  And

25  follow-ups.  So persistence.

1          So in every event here, I think we are very far from

2    the fence on a lack of standing.

3          THE COURT:  All right.  Let's then move to merits.

4          The defendants argue that McBreairty is unlikely to

5    prevail on the First Amendment retaliation claim because

6    Attorney Hewey's email didn't actually -- didn't actually

7    chill his speech since he later published the content again

8    and spoke about the offending materials.

9          What's your response to that?

10         MR. RANDAZZA:  I do not find that credible as a legal

11   or a factual argument.

12         THE COURT:  Why?

13         MR. RANDAZZA:  Because if I threaten you to, you

14   know, give me that, and you give me that but you don't give me

15   everything, that doesn't mean that I haven't threatened you.

16         The fact that Mr. McBreairty got a specific threat,

17   this article, this content of this article -- now, I don't

18   know if he subsequently published it or not.  And if I'm

19   misremembering that, I apologize.  I believe they were

20   contemporaneously published, perhaps even all of them prior to

21   the threat.

22         But even so, you know, I really don't think that

23   that's the case.

24         But if you are told, "Take down the Pentagon Papers

25   article," and then you have other publications of similar

1    material somewhere else, I don't think that that says, well,

2    you weren't actually chilled.

3        THE COURT:  All right.  So if I understand the

4    argument correctly, once the constitutional violation has

5    occurred -- which, obviously, is Mr. McBreairty's claim by

6    virtue of the demand that he take down his article.  Once that

7    has occurred, the fortuity that he may have spoken on one or

8    more of the topics in the article later doesn't do anything to

9    mitigate the harm caused by the school in the first instance.

10        MR. RANDAZZA:  I don't believe so, no.

11        THE COURT:  All right.

12        MR. RANDAZZA:  He wants to publish this particular

13    article that stands as an exhibit in this case without the

14    government using any of its powers or any of its coercive

15    abilities to tell him that he has to either take it down

16    completely, which I know they deny --

17        THE COURT:  Yeah.

18        MR. RANDAZZA:  -- or you need to edit it.

19        The government doesn't get to call up the *Bangor*

20    *Daily News* and say, "We want you to change one comma in this

21    article," without violating First Amendment.  Let alone

22    saying, "Here are four points that we want changed in your

23    article or we're going to take further action, and you better

24    do it in the next 24 hours."

25        THE COURT:  Is your client's publication of the

```
 1   photograph protected by the First Amendment?

 2            MR. RANDAZZA:  Yes.

 3            THE COURT:  And how so in light of -- so -- and I'm a

 4   little uncertain as to where the school is on this particular

 5   point.  We'll find out today.

 6            How is that protected speech in light of Ms. Hewey's

 7   argument that it's -- it violates a criminal statute?

 8            MR. RANDAZZA:  Well, I think we have to start from

 9   the proper starting line.  The presumption is everything is

10   protected.  And then the government, in order to invoke powers

11   to censor it, must show us how it is not.

12            Now, if the government says that this is -- let's

13   assume for the sake of this argument that that photograph is

14   absolutely created in violation of that statute.  And I do not

15   concede that, and I can give you an entire treatise on why it

16   isn't.

17            First of all, the statute says people have to have an

18   expectation of privacy to whom privacy is -- you know, who are

19   entitled to privacy.

20            The fact that it was taken in a bathroom does not

21   mean that they have an entitlement to privacy.  It'd be

22   different if it was in the stall, perhaps, but there's even

23   cases that say otherwise.

24            If you're sitting in a stall with a big, wide gap and

25   a police officer walks in and sees you doing cocaine in the
```

1    stall, they don't need a search warrant in order to go in

2    there and get to you.

3            So I don't think the statute itself does apply.

4    Nevertheless, let's, presume it does.  Just like in *Jean*,

5    where the First Circuit presumed that the law had been

6    violated in the creation of the video in *Jean*.  That's not

7    Mr. McBreairty's problem.

8            Now, we also have the fact that this photograph was

9    already circulating on social media at the time.  I believe

10   they've admitted that.

11           I know that Ms. MacDonald in her declaration at line

12   7 actually says, "Before the petition, there was a student who

13   took a photo of my child and other children in the girls'

14   bathroom and circulated that in the school, and it ended up

15   online."  Which is -- and then she says -- it's a violation of

16   their privacy.

17           So to say that Mr. McBreairty wouldn't have a right

18   to publish a news article with a photograph that was already

19   in circulation I think -- I just love this line from your

20   *Norris* case, you know, "Madison would recoil."  I think here

21   Madison would not just recoil, but he would weep.

22           How could we possibly say with any kind of

23   constitutional reference that a journalist who gets a copy of

24   a photograph can't publish it, period, much less one that had

25   already been published and widely circulated?  The First

1  Amendment protections for that article are bulletproof.

2          THE COURT:  I think the defendants are also arguing

3  that -- although this wasn't clear from the email from

4  Attorney Hewey to your client, but they're arguing that

5  Mr. McBreairty committed the tort of misappropriation of

6  likeness by publishing a photograph.  Does that affect your

7  merits analysis?

8          MR. RANDAZZA:  It does not.  They can say it's

9  misappropriation of likeness if, perhaps, Mr. McBreairty were

10  selling a tube of toothpaste with a picture on it.  It's not a

11  commercial use.

12          Now, I know they argue that because he doesn't write

13  voluntarily, he writes for pay, that that's a commercial use.

14          Such a ruling, I think, would invite amicus briefing

15  from every single publication in the country stating that, "We

16  are not going to be forced to become simply" -- I don't even

17  know what the -- we're going to impose socialism on every

18  publication that we're only going to do it out of the goodness

19  of our hearts.  Every single printing press in America would

20  have to shut down.

21          So it's -- I don't think it becomes misappropriation

22  of likeness simply because the person whose likeness it

23  is who -- we haven't heard from them at all.  But let's

24  presume that every person in that photograph does not want to

25  be in that photograph.  Presume that.  That's just too bad.

1    You know, it's -- I'm not without empathy.  But

2    constitutionally, it doesn't matter.

3            THE COURT:  Let me ask you about the precise nature

4    of the relief that Mr. McBreairty's seeking.

5            And, specifically, my question is:  If you're

6    likely -- if Mr. McBreairty is likely to succeed on the merits

7    of the First Amendment retaliation claim and therefore to

8    receive injunctive relief to that end, why is injunctive

9    relief concerning the schools policies necessary?

10           MR. RANDAZZA:  Because it is -- if he is permitted --

11   we want injunctive relief that he is permitted to publish this

12   article in its original form with neither threats nor coercion

13   nor action being taken against him by the government.

14           The government in this case has very credibly -- and

15   I think if you look at this -- if you look at that threat, you

16   know, I don't give a lot of credence to the after-the-fact

17   explanation that the school was simply saying those policies

18   apply to the school itself.

19           The text of the threat does not say that.  The text

20   of the threat says, "He's in violation."  This is a direct

21   duplicate of the *Hermon* case that he's fighting right now.

22           So, yes.  I am asking that the government be enjoined

23   from not only threatening him but attempting to bring that

24   civil action against him in order to try to enforce the

25   alphabet policies against him.

1          THE COURT:  Does the -- am I correct that the case

2    you referenced earlier that's currently in front of the Maine

3    law court, is that the *Hermon* school case?

4          MR. RANDAZZA:  Yes, your Honor.

5          THE COURT:  And does that involve a challenge to

6    whether the school's policies are applicable to

7    Mr. McBreairty?

8          MR. RANDAZZA:  Yes.  Mr. McBreairty in that case was

9    making statements at public meetings and making public records

10    requests.

11          The Hermon School District filed a lawsuit against

12    him seeking to take some of their alphabet policies, although

13    not all of them, just the ones that they felt he would be

14    violating if he were a student or a teacher and have those

15    converted into injunctive relief against him so that he would

16    go to jail if he violated them.

17          That is the crux of that case.  And it -- if it

18    sounds incredible to you, it sounds incredible to me.  But

19    that was first blood in McBreairty versus the education system

20    of Maine when he got sued for that.  So it is the precise same

21    thing.

22          THE COURT:  And where does that case stand presently?

23    Have you briefed to the law court or?

24          MR. RANDAZZA:  We have both briefed and argued it.

25    So --

```
 1          THE COURT:  Okay.

 2          MR. RANDAZZA:  -- any day now.

 3          THE COURT:  When was the oral argument, roughly?

 4          MR. RANDAZZA:  January.

 5          MS. HEWEY:  Recently.

 6          THE COURT:  Recently.  Okay.

 7          MR. RANDAZZA:  Yes.

 8          THE COURT:  All right.

 9          MR. RANDAZZA:  But I don't think that -- your Honor,

10   I don't think this Court should defer to that.  Because the

11   question is not:  Does Maine law allow this to happen?  It's:

12   Would the First Amendment allow it?

13          Would the First Amendment really permit the

14   government to file a lawsuit against a citizen to enforce the

15   alphabet policies to force a publication to stop publishing

16   information on a matter of public concern and a photograph

17   that was being widely circulated already at that time?

18          THE COURT:  Understood.

19          Help me out on your theory of liability regarding

20   Ms. MacDonald.  I'm struggling with what that theory of

21   liability may be given the facts set forth in the verified

22   complaint.

23          I have less of a struggle with respect to the

24   companion case brought by H.W.  But tell me about your theory

25   of liability in Mr. McBreairty's case against Ms. MacDonald.
```

1          MR. RANDAZZA:  Well, when we look in the threat

2    letter -- if I'm not remembering it correctly -- it does

3    reference Ms. MacDonald.

4          If I'm wrong about that -- yes, it references

5    Ms. MacDonald.  She is acting on either the -- the threat is

6    either on her behalf with her authority or at least with her

7    apparent authority.

8          We don't necessarily -- if she wants to stand up

9    today or her counsel wants to stand up today and say, "We

10   disclaim that.  To whatever extent you might have thought that

11   that was acting on her authority, we disclaim that authority

12   and repudiate the threat on her behalf," then I think we're

13   fine.

14         But it specifically references that one of the

15   statements that has to come out of this article or the

16   government is going to take further action is one on behalf of

17   Ms. MacDonald.

18         So I -- I don't know that they did that simply as an

19   *ultra vires* act without Ms. MacDonald's permission, but

20   nowhere in this entire briefing do I see MacDonald saying,

21   "This wasn't on my behalf.  I don't want them to do it.  And

22   Mr. McBreairty can do whatever he likes consistent with the

23   First Amendment."

24         THE COURT:  So I'm wondering, in the absence of your

25   knowing it and the absence of my knowing it and the absence of

1    any testimony or other evidence to that effect, whether I'm

2    able to resolve that question on the papers.

3         And I ask that question for the purposes of this

4    discussion, but you're going to hear that question again as we

5    get to our second case of the morning.

6         And I'm wondering if the effect of that may be that

7    it's inappropriate, to the extent Ms. MacDonald is concerned,

8    to, at the very least, grant your motion for TRO and schedule

9    a testimonial hearing for the motion for preliminary

10   injunction to resolve factual disputes that can't be resolved

11   on the papers.  Which is historically what I've done in these

12   types of cases.

13        What do you have to say about that?

14        MR. RANDAZZA:  I think we can resolve that in this

15   case with little difficulty.  Any injunction you might issue

16   in this case that includes Ms. MacDonald I think should be

17   limited to her official capacity.

18        If Ms. MacDonald does believe as a private citizen

19   that she has a private cause of action against Mr. McBreairty,

20   I don't think it would be proper to enjoin that in the order

21   we're asking you for.

22        So if it wasn't, if it was something she did as a

23   government actor, as a school teacher she called up Drummond

24   Woodsum or asked them in some way or asked the school to ask

25   them, now she's acting in her official capacity.  This is not

1    on her behalf personally.  That's the only place we're looking

2    for shelter.  Only as a government employee.

3            THE COURT:  Why is -- this is my last question unless

4    you have more arguments, which may precipitate more questions.

5            But why is relief against the individual defendants

6    appropriate?  And by "individual defendants," of course, I'm

7    referring to Superintendent Palmer and the principal and

8    Ms. MacDonald.

9            You've touched on Ms. MacDonald.  Tell me why relief

10   against the individual defendants is appropriate.

11           MR. RANDAZZA:  These individual defendants, it seems,

12   were the prime movers for this action.  I don't believe that

13   Drummond Woodsum just did this on its own.  Somebody had to

14   take the action.

15           So they should be enjoined, again, in their official

16   capacities.  We may have claims against them in their personal

17   capacities but later on.  But the injunction, just seeking

18   against them in their official capacities.

19           So somebody has to be enjoined.  If the school system

20   is enjoined and we don't have these individuals who were part

21   of the decision-making process enjoined, we might have an end

22   run that they can do around it.

23           So, again, if any one of these people feel like they

24   have a personal defamation claim -- I mean, I would not advise

25   it.  But if they think they have one, I don't want this Court

1    to tell them they don't have redress to the courts.  I just

2    want the government told that.

3         THE COURT:  Mr. Randazza, I'm happy to hear any other

4    portions of your argument you wish to emphasize this morning.

5         MR. RANDAZZA:  Your Honor, if you have no further

6    questions of me, I will yield to my friends.

7         THE COURT:  Thank you.

8         MR. RANDAZZA:  Thank you, your Honor.

9         MS. HEWEY:  Good morning, your Honor.

10        THE COURT:  Good morning.

11        MS. HEWEY:  I guess I want to start, as opposing

12   counsel did, with the standing issue.

13        THE COURT:  Yeah.

14        MS. HEWEY:  And I have really, I guess, two points to

15   make there.

16        Putting aside the fact that opposing counsel doesn't

17   appreciate sarcasm, I think that their point here is that this

18   was, and we just heard, a "looming threat."  That is how it

19   was characterized to the Court by counsel for the plaintiff.

20        I would point the Court to *Blum versus Holder*, where

21   the First Circuit made it clear that the appropriate standard

22   for standing in a pre-enforcement case is "certainly impending

23   threat."

24        So a looming threat does not meet that standard, and

25   I think that means right out of the box that there is no

1    standing in this case.

2          The second point I want to make -- and I have to

3    admit that, your Honor, you, a little bit, took the wind out

4    of my sails here.

5          THE COURT:  Sorry.

6          MS. HEWEY:  That's all right.  You get to do that.

7          -- is that I think we need to be very careful in this

8    case to separate, when we're talking about pre-enforcement

9    First Amendment cases, to separate cases that are challenging

10   the constitutionality of the statute from cases that are First

11   Amendment retaliation cases.

12         So I think that all of the cases that plaintiff cited

13   in support of their argument that they have standing are

14   actually pre-enforcement cases challenging the

15   constitutionality of a statute, where the government is saying

16   if you don't do X or if you do X or if you don't stop talking,

17   we're going to enforce this criminal statute, generally.  I

18   guess in *Bantam Books* it wasn't entirely criminal, but it had

19   some criminal overlay.  We're going to enforce this against

20   you.

21         That isn't this case because there is no threat.

22   There is no ability of the Brewer School Department to enforce

23   anything against Mr. McBreairty.

24         And so here I just want to step back for a minute and

25   talk a little bit about the policies, the school board

1    policies that there have been some questions about and I am

2    realizing that I have not been clear about.

3        So let me try to be clear.  These are school board

4    policies.  They apply -- the school can apply those policies

5    to no one that is not associated with the school.

6        The theory here and, frankly, the theory in the

7    *Hermon* case -- even though I think that that's irrelevant to

8    this case, and I'll tell you about that in a minute -- is that

9    all of those policies impose upon the school department and --

10   the obligation to protect their employees and their students

11   from certain things, specifically bullying and harassment.

12       So if a student or an employee is bullied, harassed,

13   or hazed, also, by somebody within the school, the school has

14   the ability to address that as a matter of course.

15       But if it's a third person -- party like

16   Mr. McBreairty, there's nothing that the school can do without

17   reaching out to the judicial system and saying, "Please tell

18   him to stop."  That's what the *Hermon* case was about.

19       THE COURT:  "Please tell him" -- I'm sorry.  I just

20   want to understand.

21       "Please tell him to stop."

22       And any good Court might ask in response, "What

23   authority do I have to tell him to stop."

24       And are you saying that the school policies -- or one

25   or more of the school policies gives the Court the authority

 1    to --

 2            MS. HEWEY:  No.

 3            THE COURT:  Okay.

 4            MS. HEWEY:  The school -- the theory in the *Hermon*

 5    case is that the school policies give the school department

 6    standing to bring a claim that is almost very close to being

 7    on behalf of somebody else.

 8            So he's calling a -- a Hermon School Department

 9    teacher a groomer and engaged in sexual misconduct, which is

10    false, on the internet.

11            So the Brewer School Department -- and she says --

12    she files a formal bullying complaint and says, "You need to

13    protect me."

14            Brewer can't do anything, so they go to the Court and

15    say, "We have this obligation.  We would like you to enjoin

16    her from speaking."  So that was the complaint, which you

17    have.

18            The next thing that happened was that he filed, and

19    he could have done here, an anti-SLAPP motion, motion to

20    dismiss.  That's the thing that's up before the law court.  In

21    other words, telling -- asking him not to say this, is that a

22    violation of the anti-SLAPP motion.

23            THE COURT:  Right.

24            MS. HEWEY:  The other issues are not before the law

25    court at this point.  I will tell you that during argument

1    there was some justices that expressed some questioning about

2    whether the school actually has standing to bring that claim.

3            That's for another day.  That isn't what we're

4    talking about here.

5            The only thing we're talking about here is that

6    when -- when this was published and these very specific parts

7    of the article -- no one told him to remove the whole article.

8    Just certain parts of the article that the Brewer School

9    Department felt that it had the obligation to try to address

10   with this outside person under those policies and under the

11   state law that also requires that they protect students and

12   teachers from bullying, harassment and hazing.

13           So that's all we're talking about.  This is not --

14   nobody is trying to enforce those policies against him.

15           So his only claim here is a First Amendment

16   retaliation claim.  And there, the standard, if there's going

17   to be a threat -- and I'm not sure I've seen any First

18   Amendment retaliation claims where standing sort of relies on

19   a threat.

20           But if it were to, I think you're in the *Blum versus*

21   *Holder* standard of it, it being a certainly impending threat.

22           Here, the Brewer School Department has no power, no

23   authority to do anything other than to go to a court.  They

24   have a First Amendment right to go to a court.  And if their

25   lawsuit is frivolous, if it isn't -- if there is no basis for

1    it, the courts have, in the context of that lawsuit, a way to

2    deal with it.

3         So I just don't see that there's standing here.

4         THE COURT:  So, okay.  Let me -- a couple of

5    questions on that point.

6         So I think what you're arguing is that the -- that

7    the failing -- Mr. McBreairty's failing in demonstrating

8    standing really turns on this idea that he has to -- a threat

9    of civil litigation, of going to the courts and asking the --

10   the school going to the courts, the school, obviously, can't

11   force anything on its own with respect to Mr. McBreairty, but

12   they can petition the courts for assistance to tell

13   Mr. McBreairty stop --

14        MS. HEWEY:  Yeah.

15        THE COURT:  -- stop doing what you're doing.

16        Are you saying that in pre-enforcement actions, the

17   possibility of the threat of litigation or the actual threat

18   of litigation, the threat of going to the courts and asking

19   for help, that's not enough to vest standing?

20        MS. HEWEY:  So I think that's true in the First

21   Amendment retaliation arena.

22        THE COURT:  So when does -- so I'm just curious.

23        So the First Amendment -- in the First Amendment

24   context, does a plaintiff need to wait for the whole bloom of

25   the threat to be manifest by way of an enforcement action,

1    whether it's civil or criminal prosecution or something like

2    that?

3              And then Mr. McBreairty, for example, can have his

4    day in court?  If he's on the other side of the caption, if

5    he's a defendant and Brewer School Department has sued him,

6    that's when he has standing to raise a First Amendment

7    retaliation claim, but not before?

8              MS. HEWEY:  Yes.  And he has the full force of the

9    anti-SLAPP law that allows that to be done quickly, that has

10   fee shifting and all of those things.

11             That's a whole different sort of animal than a

12   pre-enforcement case where it is the government seeking to

13   impose a usually criminal law on somebody.

14             Because here it is the very person that's trying to

15   quiet the speech who is imposing the law.  And that's a very

16   different thing than here, where we're both on the same -- the

17   Brewer School Department on one side and the -- McBreairty on

18   the other side and the same footing when they get -- if they

19   were to get to a court on some sort of lawsuit that the school

20   department might bring.

21             THE COURT:  All right.  So let me sort of try to tie

22   this to what we have so far in the pleadings.

23             So the email from the school department demanded that

24   McBreairty remove certain content from his post within a day

25   "or we will be forced to take further action against you."

**1**          Does that language, considering the fact that it came

**2**    from an attorney on behalf of her client, constitute a threat

**3**    of litigation?

**4**          MS. HEWEY:  I don't think it does.  And I think --

**5**          THE COURT:  Okay.  Tell me why.

**6**          MS. HEWEY:  And I think that -- and this is -- I

**7**    don't have any case law on this issue.  But I think as a

**8**    practical matter, lawyers write letters all the time that say,

**9**    "Take this down.  Apologize.  Do this, do that, or we'll be

**10**   forced to take further action."

**11**         THE COURT:  Sure.

**12**         MS. HEWEY:  And what they mean is they're hoping it

**13**   will happen, and then we're going to assess what, if anything,

**14**   we can do.

**15**         So I don't think that this is an immediate threat.  I

**16**   think this is saying sort of, "We really, really mean it."

**17**         THE COURT:  All right.  And I don't want to get too

**18**   far in the weeds here, but I'm just -- your answer left open

**19**   the possibility that the school board may have simply wished

**20**   to have another moment to roundtable the issue, soberly

**21**   evaluated whether they would do anything if he failed to take

**22**   down his publication.

**23**         But the email demanded that Mr. McBreairty remove

**24**   certain content or "we will be forced to take further action

**25**   against you."  Not "forced to have a salon-type meeting of the

1    minds and a philosophical discussion about the wisdom of

2    taking action against Mr. McBreairty."

3         So I'm just trying to inch this along to the

4    practical implication of the email.  Does that change your

5    mind?  Does that constitute a threat of litigation?

6         MS. HEWEY:  It doesn't.  And particularly given the

7    First Circuit requirement that this be an impending threat.

8         So it's not -- it doesn't get there.  That's --

9         THE COURT:  And -- yeah.

10        MS. HEWEY:  And I will say -- I mean, I think that

11   opposing counsel touched on it a little bit in his argument.

12        And that is that it's not just the school department

13   here.  There are kids --

14        THE COURT:  Sure.

15        MS. HEWEY:  -- and there are employees.  And nobody's

16   going to go running into court until and unless everybody is

17   comfortable with that.

18        And I will note, too, with -- when we're talking

19   practically about the picture in the bathroom, that's not one

20   child.  That's four different children --

21        THE COURT:  Understood.

22        MS. HEWEY:  -- whose privacy was invaded.

23        THE COURT:  All right.  So -- all right.  So I want

24   to be sure that I understand.

25        So just -- we don't even get out of the box as to --

1  we're talking about two different things here with respect to

2  the element of standing.  One of those things is:  Is there a

3  threat of litigation?

4         And I agree with you that as a practical matter, the

5  case law tends to tilt heavily toward circumstances in which

6  there's a criminal statute -- the threat of a criminal statute

7  being enforced which someone claims may impinge their First

8  Amendment rights.

9         But, as you know, in the First Amendment context, a

10 pre-enforcement threat of civil litigation can vest standing.

11        So what I'm trying to understand step by step here is

12 the email that you sent to -- on behalf of the Brewer School

13 Department to Mr. McBreairty -- let's leave out qualifying

14 words like "looming" and "pending," Sword of Damocles.  How

15 close are we to actually executing the threat?

16        Does that language constitute a threat of enforcement

17 by way of a lawsuit given the historical travel of the

18 relationship between you and your law firm and Mr. McBreairty?

19        MS. HEWEY:  So I don't think that it is a threat.

20        THE COURT:  Okay.

21        MS. HEWEY:  It is true that Mr. McBreairty takes a

22 position that is adverse to a number of school districts in

23 the state --

24        THE COURT:  Right.

25        MS. HEWEY:  -- and that Drummond Woodsum represents a

1    number of school districts in the state.

2              THE COURT:  Right.

3              MS. HEWEY:  But every client and every case is

4    different.  This is not a personal vendetta.

5              In that regard, I would note that in the *Doe versus*

6    *RSU 26* case, I was on the other side of the issue.  So --

7              THE COURT:  Sure.

8              MS. HEWEY:  -- being a lawyer means representing your

9    client.  And I don't think that this Mafia thing really -- as

10   much as I did kind of enjoy it, it doesn't really work.

11             So, I mean, just getting back to the issue here --

12   and I do again want to encourage the Court, when you're

13   looking at these threats of litigation, to look at who's

14   making the threat and what type of threat they're making.

15             Because it's in every case that's been cited, they're

16   making a threat to base the litigation on an unconstitutional

17   statute or rule.  That's a lot different than saying, "We

18   don't think what you're doing is right, and we're going to go

19   to a court and ask if it is right."  That is not a threat.

20             THE COURT:  Well, that's just -- so that -- I

21   understand the distinction you're trying to draw.  I'm

22   wondering if it's meaningful or if the case law says it's

23   meaningful.

24             What you're talking about is the proximate mechanism

25   to enforce the desire to have the speech taken down, let's

1    say.  In other words, you're talking about the mechanism of a

2    statute which would require that the speech be taken down

3    because it's criminal or whatever.

4          Is the threat of civil litigation to effect the same

5    result, to get the speech taken down and therefore to chill

6    the speech in the first instance, enough to constitute a

7    threat for purposes of standing?

8          MS. HEWEY:  I have found no case that says that is

9    enough.  I will acknowledge that that does not mean that there

10   is no case, but I don't think there is.

11         THE COURT:  Okay.  And if the first email -- and I

12   understand that you don't consider the email a threat.

13         But if I conclude that the first email is read as

14   threatening litigation unless Mr. McBreairty removed the

15   identified content from his post, does Mr. McBreairty then

16   have standing?

17         MS. HEWEY:  And as I've said before, I don't think it

18   does because I don't think that that threat is enough except

19   in a challenge of a statute.

20         THE COURT:  So let's talk about the school policies,

21   then, as it relates to standing.

22         The email said that certain portions of the article

23   have -- let me make sure I get this right -- have the effect

24   of bullying and hazing a student and a teacher at the Brewer

25   High School in violation of board policies ACAD, ACAF, and

1    JICK and Maine law.

2          And the email also references that the post has

3    caused Brewer High School and staff members severe distress

4    within the meaning of 20-A, MRS Sections 6553 and 6554.

5          Do the references to the school -- the board policies

6    and related Maine statutes threaten that they may be enforced

7    against Mr. McBreairty?

8          MS. HEWEY:  No, they don't.  And they don't for two

9    reasons.  One is the plain language of the email says these --

10   the inappropriate postings have the effect of bullying and

11   hazing a student and a teacher in violation of the statutes.

12         So what it's saying there is that that conduct

13   constitutes bullying and hazing, thereby kicking in the school

14   department's obligation to address it.  That's all it's

15   saying.

16         And I said two things, but the other one has left me.

17         THE COURT:  All right.  If you remember it, you can

18   tell me.

19         MS. HEWEY:  Okay.

20         THE COURT:  I don't want to get bogged down too much

21   in what the SJC is wrestling with at the moment in terms of

22   standing.

23         But what do you suppose the Brewer School Department

24   would have by way of jurisdiction over Mr. McBreairty

25   whatsoever in terms of imposing -- I think you said they don't

1    have -- they can't impose the school policy -- the board

2    policies over Mr. McBreairty.  True?

3         MS. HEWEY:  That's exactly right.

4         THE COURT:  Okay.

5         MS. HEWEY:  And that's one of the reasons that I

6    don't think they have standing.

7         This is a school department.  And when we keep

8    talking about them as if they're -- I mean, they are a

9    governmental entity.  But they're not the government.

10        It's the Brewer School Department.  He doesn't live

11   in Brewer.  He doesn't have kids in Brewer.  He doesn't work

12   in Brewer.  That's all they have.  They have no more power

13   over Mr. McBreairty than Gavin Newsom does.

14        And I think that that's important because that means

15   that there cannot be the threat that we've heard so much

16   about.

17        THE COURT:  So a general threat of "may be compelled

18   to take further action" coming from -- and I'm not picking on

19   you or your law firm, just the historical context of your law

20   firm representing schools with which Mr. McBreairty has had

21   legal complications.  That doesn't do it in terms of

22   demonstrating an imminent threat?

23        MS. HEWEY:  It doesn't.  And it clearly does not

24   chill his speech, as we've shown in our opposition.

25        THE COURT:  So let's get to that.  So let's talk

1    about the merits.

2         Let me ask if the email threatening litigation, does

3    that email then amount to adverse action for purposes of the

4    First Amendment retaliation claim?

5         MS. HEWEY:  So those are two very similar --

6         THE COURT:  Yeah.

7         MS. HEWEY:  -- concepts.  Although I think, as we

8    pointed out in our brief, there are additional reasons why

9    that's not adverse action, i.e., that the school department or

10   anybody has a First Amendment right to bring a lawsuit if they

11   feel like they've been wronged.  That's sort of the right way

12   to do things rather than take things into your own hands.

13        And also, as we pointed out cases that established

14   that the school department itself has a First Amendment right

15   to say, "Take that down.  That's inappropriate."

16        So we don't think that doing what you have a right to

17   do and no more could possibly be adverse action.  There has

18   been no adverse action here.  And I, frankly, can't see how

19   the school department could take adverse action against

20   Mr. McBreairty.

21        THE COURT:  All right.  So you're -- when you say you

22   can't see how the school department can take adverse action,

23   you're saying because they can't prosecute Mr. McBreairty for

24   a violation of the criminal code directly, all they can do is,

25   at most, sue him in civil action.

1          But suing him in civil action or threatening him to
2   do so does not constitute enough of an adverse action to give
3   him a retaliation claim on the First Amendment?
4          MS. HEWEY:  Not only does it not constitute enough,
5   but they have a right to do that.  You have a right to go to
6   the Court and say, "We have a dispute here, Court.  Tell us
7   who's right."
8          If you didn't have that right and you just had to sit
9   back and never know, that doesn't make any sense.  In our
10  society, if you have a dispute, you can't solve it by
11  yourself, you go to the Court and the Court tells you which
12  side is right.
13         THE COURT:  But you're talking about the procedural
14  order by which this dispute between Mr. McBreairty and the
15  school department could have hypothetically unfolded as
16  opposed to how it unfolded, and I'm wondering if that makes
17  any difference.
18         So, in other words, in your example, you're right,
19  obviously.  If the school department has a right to -- if they
20  wanted to, they could have sued Mr. McBreairty.
21         But I would expect that in such a case, that wouldn't
22  have simply done away with Mr. McBreairty's First Amendment
23  retaliation claim.  He probably would have counterclaimed for
24  a retaliation claim.
25         MS. HEWEY:  Exactly.

```
 1              THE COURT:  So --
 2              MS. HEWEY:  And I don't think -- I think instead
 3     of -- I think what the Court would have done, then, is dismiss
 4     that counterclaim and said, "If you challenge what the school
 5     department has done, then it's an anti-SLAPP -- your remedy
 6     goes through the anti-SLAPP law."
 7              And, importantly, the anti-slap law kicks in after
 8     the lawsuit has been filed, after you know whether -- after
 9     you know what the claims are.  I don't see how this Court can
10     enjoin any lawsuit without knowing what the theories are.
11              THE COURT:  All right.
12              MS. HEWEY:  I think it's not ripe, at the least.
13              THE COURT:  So you argue that Mr. McBreairty's speech
14     was not chilled because he continued to publish and talk about
15     the offending material.  But were Mr. McBreairty's subsequent
16     activities outside the scope of the email demand?
17              MS. HEWEY:  So I'm not sure I understand your
18     question.  If you're saying was he doing things that were
19     different from what was published --
20              THE COURT:  Right.
21              MS. HEWEY:  -- in there?  I think that --
22              THE COURT:  Or -- or -- not things that were
23     published in there but, more specifically, the offending
24     portions that the email demanded he take down.
25              MS. HEWEY:  So I think that we provided the Court
```

1   with a link to a podcast where the picture of the student was

2   shown and where the -- I think the language -- and I'm not

3   sure whether it was printed or just spoken about the student

4   being a sexual -- engaging in sexual misconduct was also

5   republished.

6          THE COURT:  Okay.

7          MS. HEWEY:  I don't know that anything concerning

8   Ms. MacDonald's student was.

9          THE COURT:  Okay.  The language that you quoted from

10  *Nelson versus Maine Times* discusses appropriation of another's

11  likeness.

12          I just wanted to know.  Is that -- so that was the

13  confusion that I was alluding to to Mr. Randazza.

14          Is that the tort that the defendant is relying on --

15          MS. HEWEY:  The tort we're relying on is invasion of

16  privacy, and there are different levels of invasion of

17  privacy.

18          I'm not saying that misappropriation of likeness

19  doesn't apply.  I think more likely the public disclosure of

20  private facts is -- is more on point here.

21          THE COURT:  Okay.  And the argument, I take it, is

22  that whatever species of invasion of privacy you're relying

23  on, and you're contending that Mr. McBreairty's use of the

24  photo app, at least, is tortious and therefore not

25  constitutionally protected.  Could you just elaborate a bit

1   for me about that argument.

2          MS. HEWEY:  Yes.  So I think that it's pretty clear

3   that defamatory language and language that is otherwise

4   wrongful and tortious is not subject to at least as much

5   constitutional protection.

6          And so putting aside the defamatory conduct, what our

7   theory is on the invasion of privacy conduct is that we have a

8   statute that makes it pretty clear that things like this are

9   an invasion of privacy.

10          And I know that there was an argument previously that

11   taking a photo of children in a bathroom is not an invasion of

12   privacy.

13          I just will tell the Court that I, frankly, disagree.

14          This is a school.  These are students.  They're in

15   the bathroom.  They have an expectation of privacy.  When

16   parents send their kids to school, they expect that their kids

17   are going to be -- have a private bathroom.

18          THE COURT:  Is there evid -- because I may have

19   missed it -- is there evidence so far on the record that

20   Mr. McBreairty took that photograph?

21          MS. HEWEY:  No.

22          THE COURT:  Okay.

23          MS. HEWEY:  And I think everybody acknowledges that

24   it is highly unlikely that he took the photograph.

25          THE COURT:  Right.

**1**        MS. HEWEY:  So that's where we start going down the

**2** rabbit hole of the legality.

**3**        THE COURT:  Right.

**4**        MS. HEWEY:  And in that case, what -- what plaintiff

**5** focuses on is:  It's okay to use an illegally --

**6**        THE COURT:  Right.

**7**        MS. HEWEY:  -- and what we focus on is something a

**8** little bit different, which is:  It's not okay to use a

**9** photograph of children in a bathroom.

**10**        The cases that plaintiff cites, like the Pentagon

**11** Papers and some of the others all -- the *Jean* case, they all

**12** talk about publishing a matter of public concern.

**13**        Seeing children in a bathroom, it is the Brewer

**14** School Department's position, is not a matter of public

**15** concern.

**16**        THE COURT:  Right.

**17**        MS. HEWEY:  It's a matter of extreme privacy.  And

**18** that's the basis of our claim.

**19**        THE COURT:  Sure.  In the broader context, do you --

**20** you got to my next point before I did.  So that's exactly

**21** where I wanted to go next.

**22**        Do all of the portions of Mr. McBreairty's article

**23** involve a matter of public concern?

**24**        MS. HEWEY:  So -- and I'm going to try -- I think I

**25** understand what your question is.

1          There is a lot in that article --

2          THE COURT:  Yeah.

3          MS. HEWEY:  -- that involves a matter of public

4    concern and that he has a right to speak.  I do not -- and

5    I -- but I do not think, for example, a picture of students in

6    the bathroom is a matter of public concern under any analysis.

7          THE COURT:  Well, one of those students, presumably,

8    was the student who is -- identifies as a girl, correct?

9          MS. HEWEY:  One is gender expansive, yes.

10          THE COURT:  Okay.  So because of that identification,

11    that person uses that bathroom, and that was -- the larger

12    context, I guess is what I'm trying to get at, of the article

13    is this policy dispute over whether Hermon ought to have this

14    policy or not and whether bathrooms ought to be assigned on

15    the basis of biological sex and not anything else.

16          And I think you -- I think the department correctly

17    has conceded that point insofar as it goes.

18          So some of his article is a matter of public concern.

19    That's a debate.  However one feels about those sides of the

20    debate, it's a debate and it's a matter of public concern.

21          So now I think what we're just talking about when

22    we're talking about the contested portions of the article is.

23    Are they proximate enough to the public concern part of the

24    debate to enjoy speech protection.

25          And you're telling me that the photographs of the

1    students in the bathroom are outside of a matter of public

2    concern.  Is that because that constitutes tortious conduct?

3         I'd like to confine at least this part of the

4    discussion to is that close enough to the purpose of the

5    article, meaning the policy debate that's happening underneath

6    all of this First Amendment challenge.

7         MS. HEWEY:  So, partially.

8         THE COURT:  Yeah.

9         MS. HEWEY:  Because I want to be precise here.

10        THE COURT:  Yeah.

11        MS. HEWEY:  Part of it is because it's an invasion of

12   privacy.  But going beyond that to what I think the Court is

13   getting at is putting -- you're asking me to put that aside

14   for a moment.

15        THE COURT:  Yeah.  Yeah.

16        MS. HEWEY:  And I will do that.

17        I do not think that the individuals in a bathroom are

18   a matter of public concern.  The issue is:  Are -- should we

19   divide the bathrooms by biology.

20        THE COURT:  Wasn't Mr. McBreairty trying to support

21   his policy argument by saying, "This is really -- this is

22   really going on, isn't this awful, and these are reasons why

23   the school department ought to change its policies and here's

24   evidence of it"?  Here's evidence of it.

25        MS. HEWEY:  That is not -- that picture is not

```
 1   evidence of anything.  It's evidence of four students in the
 2   bathroom.  That's it.
 3         It doesn't prove or disprove who's using the bath --
 4   what the biological sex of anybody at Brewer is using the
 5   bathroom.  It just absolutely has nothing -- it does not move
 6   the debate forward, backwards or sideways.
 7         It's a picture of kids in the bathroom.  That is not
 8   a matter of public concern.  And, I mean, I think it's really
 9   important that we understand these are kids.  This is a
10   school.
11         The issues are important.  But bringing it down to
12   the individuals and putting their pictures on the internet,
13   that doesn't add to anything.  And, even though I promised I
14   would try to keep that out, it is an invasion of privacy.
15         THE COURT:  Okay.  Does the school concede that
16   Mr. McBreairty is a media defendant?
17         MS. HEWEY:  No.
18         THE COURT:  Okay.
19         MS. HEWEY:  And I don't think -- and we didn't
20   address that in the briefing.
21         THE COURT:  Yeah.
22         MS. HEWEY:  Because I don't think that it is actually
23   alleged or in the complaint or briefed in their brief.  They
24   say he's a journalist, but they do not say he's a media
25   defendant.  I can speak to that issue, if you'd like me to.
```

```
 1              THE COURT:  Yeah.  Would you?  So do you think --
 2              MS. HEWEY:  Rather than you having us ask for further
 3    briefing?
 4              THE COURT:  Yeah.  I don't want any further briefing.
 5              MS. HEWEY:  Good.
 6              THE COURT:  I've asked for too much already.
 7              Let me ask you first, though, before you talk about
 8    the substance of what that means to your analysis if we do
 9    conclude or I conclude that Mr. McBreairty is a media
10    defendant, why do you -- why do you think that there is a
11    relevant distinction between a pleading that says he's a
12    journalist and using the magic words "media defendant"?
13              MS. HEWEY:  I don't think there is for the purpose --
14              THE COURT:  Okay.
15              MS. HEWEY:  -- of the -- of what the Court is looking
16    at now.
17              THE COURT:  Okay.  Okay.
18              MS. HEWEY:  I think later on down the road, if we go
19    to the issue of damages and --
20              THE COURT:  Sure.
21              MS. HEWEY:  -- liability, that that might be an
22    issue.
23              THE COURT:  Fair enough.  Okay.
24              So now let's talk about how that affects the school's
25    argument if we conclude that -- at least for the purposes of
```

```
 1  where we are in the proceedings now, that Mr. McBreairty is a
 2  media defendant.
 3          MS. HEWEY:  So, are you asking me to --
 4          THE COURT:  Let's assume that I conclude that
 5  Mr. McBreairty is a media defendant and let's also assume that
 6  I conclude that his article involved matters of public
 7  concern.
 8          Would the school agree that his speech is therefore
 9  protected unless the defendants meet their burden in proving
10  that his statements were false?
11          MS. HEWEY:  False or malice, there's -- I'm not
12  entirely certain of all of the -- there is a higher standard
13  for media defendants.  And we would need to prove falsity or
14  that it was published with malice, et cetera, yes.
15          THE COURT:  So have -- okay.  So let's stay with our
16  hypothetical premise to the question.
17          Have the statements about H.D., which arguably imply
18  that H.D. committed a sexual assault, have those statements,
19  right now, in the preliminary stages, been proven false on the
20  papers?
21          MS. HEWEY:  Well, there is certainly a -- so using
22  the standard of proof that the Court is faced with --
23          THE COURT:  Yeah.
24          MS. HEWEY:  -- more likely than not, I think that we
25  have proven them false.  Because I think you have Gregg
```

1    Palmer's declaration, and all you have from Mr. McBrearity and

2    H.W. is that they heard from somebody else that this might

3    have happened.

4         THE COURT:  Which is reflective of what was said in

5    his publication.  So, I'm trying to track what he says in his

6    publication that the offend -- what the school department

7    finds is part of the offending language and how that matches

8    up with the defendant's burden of proving those statements

9    false.

10        So, Palmer acknowledges -- Superintendent Palmer

11   acknowledges that there was an accusation, accusation of

12   sexual assault against H.D.

13        MS. HEWEY:  Not sexual assault.  There's a difference

14   between touching and sexual assault.

15        THE COURT:  So he investigated sexual touching

16   against H.D.

17        MS. HEWEY:  I think he just said "touching."

18        THE COURT:  Okay.  But that it was found to be

19   without merit.

20        MS. HEWEY:  Yes.

21        THE COURT:  All right.  So, on the other hand, if

22   McBrearity had provided evidence -- has provided evidence that

23   people have accused H.D. of sexual assault -- which is what he

24   basically says in his -- in his article.

25        So, in light of that conflicting evidence -- this

1    gets back to my original question.  So we have conflicting

2    evidence.  Does McBreairty prevail, at least for now, as to

3    those statements since the burden is on the defendants to

4    prove the statements to be false?

5         It doesn't foreclose, obviously, the defendants down

6    the road, at a preliminary injunction hearing, if we have one,

7    that involves testimony or hearing on the merits or

8    consolidated hearing on both, from putting on evidence that

9    those statements were false.

10        But for now does that conflicting evidence on the

11   paper mean that the defendants have failed to prove that the

12   statements are false?

13        MS. HEWEY:  To prove that that particular statement

14   is defamatory.  Is that what you're asking me?

15        THE COURT:  Correct.

16        MS. HEWEY:  I -- I -- again, I don't think so.

17   Because I think that what Mr. McBreairty has said is that

18   somebody -- people have claimed that this person engaged in

19   sexual assault.  That's all he says.  But it clearly implies

20   undisclosed defamatory facts.

21        On the other hand, what the superintendent has said

22   is, "We have looked into it and we have found, we have -- we

23   have determined that that's not true."

24        So I would contend, and the Court may disagree with

25   me, that if you put that on the scale, there's a tip -- ever

1    so slightly, I would acknowledge -- towards --

2          THE COURT:  The school.

3          MS. HEWEY:  -- in favor of the school department.

4          THE COURT:  All right.  And, finally -- at least as

5    far as I'm concerned.  But you're welcome, Ms. Hewey, to point

6    me to any particular part of your argument that you think

7    deserves special attention.

8          I want to just ask you about the statement regarding

9    Ms. MacDonald and her child "who pretends to be a boy."  You

10   argue that statement is false, so we're still in the realm of

11   the burden is on the school to demonstrate that that statement

12   is defamatory.

13         Is that a -- tell me how that statement is false.  Is

14   that a characterization or is that something that is

15   susceptible to being proven false?  Because I'm forecasting

16   that Mr. McBreairty is going to say, "That's my opinion.

17   That's how I characterize transgender."

18         MS. HEWEY:  So I can imagine that if we go all the

19   way to trial in this case that that would be a subject of

20   expert testimony --

21         THE COURT:  Right.

22         MS. HEWEY:  -- about how if you identify with a

23   gender that that's genuine and it's not pretending.  And I

24   could imagine that we would also have expert testimony saying

25   that this person genuinely identifies as something different

1    than their biological --

2          THE COURT:  Right.

3          MS. HEWEY:  -- sex.

4          So I don't think, ultimately, that that is a matter

5    of opinion.  I think it's a matter of fact.

6          THE COURT:  Right.  Fair enough.

7          MS. HEWEY:  I also think that it's, again, an

8    invasion of privacy.  And I don't think that he has any First

9    Amendment right to say those basically unkind, unnecessary

10   statements about a student.

11         THE COURT:  Okay.  Fair enough.

12         So you say "ultimately."  And I agree that I could

13   see a trial playing out just as you've described it on that

14   point.  But we're not at "ultimately" today.  So what do I do

15   today on the motion for TRO?

16         MS. HEWEY:  So, first off --

17         THE COURT:  Yeah.

18         MS. HEWEY:  -- I think that there are a number of

19   reasons for you to deny the TRO.

20         To the extent that the Court is going to grant a TRO

21   because it does not feel that that particular language -- or

22   it feels that that particular language is protected by the

23   First Amendment, then I suppose that the order would say that

24   they have the right to publish that.

25         But I want to just drill down on that because in

1    order to even make that order, then -- and I don't want to

2    reprise what I said before, but I don't know how the Court

3    gets there.  Do you say, "You, Brewer, cannot bring a

4    lawsuit"?

5            THE COURT:  Don't know how I get there as far as

6    fashioning a relief?

7            MS. HEWEY:  Yes.

8            THE COURT:  Okay.  Yeah.

9            MS. HEWEY:  "You, Brewer, cannot bring a lawsuit"?  I

10   don't think that the Court can do that because you don't know

11   what lawsuit the Court -- what lawsuit would be brought.

12           What they want, essentially, is a declaration that he

13   has the right to do this.  That is not -- not appropriate at

14   this stage.

15           And you can't fashion -- I don't -- they didn't ask

16   for specific relief --

17           THE COURT:  You think that constitutes an advisory

18   opinion if I --

19           MS. HEWEY:  Yes.

20           THE COURT:  -- just issue the relief that they're

21   seeking.

22           MS. HEWEY:  Exactly.  They didn't ask for a precise

23   relief.  And I think the reason they didn't ask for a precise

24   relief is because there's no precise relief that the Court can

25   grant.

1          THE COURT:  Thank you.

2          MS. HEWEY:  Thank you.

3          MR. HADDOW:  Good morning, your Honor.

4          THE COURT:  Good morning.

5          MR. HADDOW:  As you know, I represent Michelle

6    MacDonald.

7          THE COURT:  Yes.

8          MR. HADDOW:  And I'll be extremely brief because I

9    think, honestly, that my client's part in this is very small.

10          As the Court noted earlier in the colloquy with

11    Attorney Randazza, there is only really one possible basis on

12    which any relief might be granted against Michelle MacDonald.

13    And that would have to be that somehow the communication from

14    the Brewer School Department's counsel would be attributed to

15    her.  There's nothing that --

16          THE COURT:  That the Brewer School Department was an

17    agent acting on behalf of Ms. MacDonald and Ms. Hewey was an

18    agent acting on behalf of both.

19          MR. HADDOW:  That is what would have to be concluded.

20    Correct.

21          THE COURT:  Right.

22          MR. HADDOW:  There is absolutely no evidence here

23    whatsoever that Attorney Hewey was acting as an agent for --

24          THE COURT:  Her client.

25          MR. HADDOW:  Yeah, Michelle MacDonald.

1          THE COURT:  Right.

2          MR. HADDOW:  And there's also no evidence that the

3     Brewer School Department was acting as an agent for

4     Ms. MacDonald.

5          Now, that doesn't mean to say that the Brewer School

6     Department wasn't standing up for her, as it was for the other

7     people that -- the children who were mentioned in the post.

8     But that is not the same thing as acting as her agent.

9          And Mr. Randazza made mention of apparent agency.

10    But in order for there to be apparent agency, it has to be

11    reasonable for someone to conclude on whatever is being

12    presented to them that the apparent agent is acting on behalf

13    of the apparent principal.

14         THE COURT:  Which probably is a closer call to so

15    conclude in the circumstance of, say, the principal and

16    superintendent --

17         MR. HADDOW:  Correct.  Correct, Judge.

18         THE COURT:  -- as opposed to -- no offense but as

19    opposed to another teacher.

20         MR. HADDOW:  Precisely, your Honor.  That's exactly

21    it.

22         And, also, that also goes directly to the second part

23    of my argument, which is Ms. MacDonald, because she's no part

24    of the administration, even if the Court should conclude that

25    the administration could take some meaningful action against

1    Mr. McBreairty, Ms. MacDonald doesn't -- doesn't have any

2    official capacity in which they could do that.

3            So unless, your Honor, you have further questions,

4    that's all I really have to say today.

5            THE COURT:  I don't.  Thank you very much.

6            MR. HADDOW:  Thank you, your Honor.

7            THE COURT:  Mr. Randazza.

8            MR. RANDAZZA:  Thank you, your Honor.

9            Your Honor, I'll dispense with the discussion about

10   Ms. MacDonald --

11           THE COURT:  Sure.

12           MR. RANDAZZA:  -- very quickly.

13           And if my friend would like to come back up to the

14   podium and say they had no authority to act on her behalf and

15   the fact that in this bullet list of things that my client has

16   to do or face further action, that third one is unauthorized,

17   then we would have to concede we don't need relief against

18   her.

19           I didn't hear that.  I did invite it in my opening.

20   However, I think the more concerning discussions have to be

21   about the government defendants.

22           Now, there's this claim that they don't know what

23   you're going to enjoin because they haven't sued my client

24   frivolously yet.

25           Well, if anybody in this courtroom, or we can take a

1   recess and call every single attorney we know and say, "Come

2   up with a claim that would be constitutional, that would

3   prohibit this publication," then maybe we have a different

4   argument.

5          There's nothing.  The Pentagon Papers were stolen

6   classified information, and those were subject to a dec

7   action.  Those were something that the government could not

8   stop *The New York Times* from publishing.

9          But this picture somehow has greater talismanic power

10  than stolen classified documents.  Madison wouldn't just

11  recoil or weep.  He would vomit on that.

12         THE COURT:  Well, on that -- let me try to sort of

13  narrow us in on that particular part of the argument.

14         I'm not sure if we need to -- as much as I enjoy

15  invoking the spirit of James Madison, I'm not sure we need to

16  go that high or that far.  And I'm not sure we need to go as

17  far as the Pentagon Papers to -- for you to make your point.

18         I'm back at, on the merits of the claim, isn't there,

19  at least in the preliminary stages, a colorable argument for

20  Mr. McBreairty to make that publication of the photograph --

21  which was, in part, the offending speech that the department

22  complained about -- related to a matter of public concern,

23  which was basically the rest of the corpus of his article,

24  which is the dispute with the Brewer School Department

25  policies on bathrooms and who could use them?

```
 1          MR. RANDAZZA:  Of course.

 2          THE COURT:  Isn't this photograph just an extension

 3   of that expression of public concern?

 4          MR. RANDAZZA:  Of course.  But we don't even need to

 5   go that far.  Even if it was just illustrative, even if it was

 6   just four people hanging around in a bathroom that had nothing

 7   to do with it, he would still be allowed to publish that.

 8          If he could have gone and pulled this off of

 9   Wikipedia or pulled it off of any social media, which is where

10   he got it, that would still be protected.

11          The fact that this illustrates this story raises that

12   protection, the fact that it actually shows the subject of the

13   story in it.  They're going to say that because it invades

14   that person's privacy, you can't have the subject of the story

15   in the picture?  That's -- it simply doesn't -- it doesn't

16   track.

17          And, you know, I would thank the -- Mr. Haddow for,

18   you know, his statement.  And his response to that is to say

19   it would be fair to say the Brewer School Department's

20   policies involving school bathroom access is a matter of

21   public concern.  Political issues regarding gender identity

22   are a matter of public concern in the case that he cites.

23          So he has every right to publish all the other

24   information and opinions on that subject.

25          THE COURT:  All right.  Thank you, Mr. Randazza.
```

1        You took notes feverishly.  I was watching you while

2   your counterparts were presenting their arguments.  I don't

3   want to sidetrack you from whatever you'd like to address.

4        MR. RANDAZZA:  No, no.  Please.  That's the fun part.

5        THE COURT:  All right.

6        Well, so I asked Ms. Hewey questions related to how

7   we're to interpret the email from Attorney Hewey both in terms

8   of establishing standing and in terms of at least getting out

9   of the batter's box on the First Amendment retaliation claim.

10        The school's position, she made it very clear to me,

11   is you only cited to cases that involve -- that don't involve

12   pre-enforcement actions, first of all.  And they involve cases

13   that raise the alleged unconstitutional nature of criminal

14   statutes and the prospect that those would be enforced by way

15   of a prosecution.

16        More to the point, the school is taking the position

17   that in no way can -- could I reasonably interpret her email

18   or emails as constituting a threat sufficient enough to vest

19   standing with Mr. McBreairty.  And I'd like to give you an

20   opportunity to respond to that.

21        MR. RANDAZZA:  Yeah.  Well, I did take a lot of notes

22   on that particular issue.

23        Because it seems to me that the argument was:  Since

24   the school can't do anything here, its threats were empty.

25   And since its threats were empty, there's no adverse

1    government action.  That floors me that that's the

2    government's argument.

3        If this had said, "Mr. McBreairty, stop publishing on

4    this or you're going to get an IRS tax audit ordered by us" --

5        THE COURT:  Right.

6        MR. RANDAZZA:  They could do that.  Would you be

7    telling me, would anybody be arguing that that's not the

8    government making a threat?

9        The government has threatened Mr. McBreairty.  So

10   Mr. McBreairty is then tasked with understanding that this

11   threat -- which, first, threatens to enforce school policies,

12   which he's been sued for before by the same signatories.

13       Then it actually threatens a use of a criminal

14   statute.  17-A MRS Section 511 is a criminal statute.

15       So is Mr. McBreairty supposed to say, "Well, this

16   piece of the government can't actually enforce a criminal

17   statute"?  Well, how's he supposed to know that?

18       If I got a letter from, you know, the dog catcher

19   saying that they were going to have me audited, I mean,

20   anything -- I'd know better because I'm a lawyer.  But

21   Mr. McBreairty, a mere citizen, is supposed to know that?  Is

22   supposed to track all that and say, "Well, they can't do

23   anything to me"?

24       Meanwhile --

25       THE COURT:  You're saying that a reasonable person

1  would interpret that as being the threat of at least

2  referring -- obviously, the Brewer School Department can't

3  prosecute anyone.  Are you saying that Mr. McBreairty -- it's

4  reasonable that Mr. McBreairty may have interpreted that to

5  mean they would refer it for prosecution?

6        MR. RANDAZZA:  Yes.  Or even for him not to know that

7  the school department can't do that.  He doesn't know the

8  whole structure of the Maine government.  I don't even know

9  the whole structure of the Maine government.

10        But this threat has a threat of a use of a criminal

11  statute.  So I don't know why we're all -- there's some

12  confusion on the defense side that there's no criminal statute

13  here being invoked.  It's right there.  I see it.

14        THE COURT:  Is the threat of further action, which

15  was expressed in the email, is that enough?

16        MR. RANDAZZA:  Yeah.  Your Honor, if I'm --

17        THE COURT:  Take away the -- despite what one thinks

18  about the validity of the threat of a criminal statute or we

19  have these school board policies which we are required to

20  enforce for the benefit of our student body and our staff,

21  just leave all of that aside.

22        Would the language of the email as it pertains to

23  "stop publishing this or we will be forced to take further

24  action," does that alone constitute a threat both for purposes

25  of standing and adverse action --

```
 1            MR. RANDAZZA:  It does.

 2            THE COURT:  -- for purposes of the First Amendment

 3    claim?

 4            MR. RANDAZZA:  It does.  I think less than that

 5    would.  I think if it just said, "Stop publishing it.  Signed,

 6    the government," that's enough.

 7            But we're well beyond that.  It's:  "Stop publishing

 8    it, or here's a criminal statute, here are some policies, and

 9    here's a civil claim."

10            They ran the table.  They brought the whole trifecta:

11    administrative, civil and criminal.  I mean, it's like they're

12    sitting there with a bat, tapping themselves in the hand,

13    saying, "Get out of here or else."

14            You don't have to say, "Or else I'm going to hit you

15    with the bat."  You know why they're holding a bat.  You know

16    what the bat is for.  They're not inviting you to a softball

17    game.

18            THE COURT:  I think the -- and Ms. Hewey will correct

19    me if I'm wrong.  But the way I understood the school's

20    argument is it's a little more nuanced than that.

21            Her argument, I believe, when we were having our

22    exchange, is that the school ought to be, and is, allowed to

23    petition the Court.

24            And your client's avenue of redress is not to come

25    get what she characterizes as an advisory opinion giving
```

1    prophylactic effect to all of the speech that Mr. McBreairty

2    wants to give, notwithstanding school policies, criminal

3    statutes, or anything else, so long as he's raising a matter

4    of public concern.

5         And I further think that the school's argument is

6    they're allowed to go to court and ask for that relief.

7         And your client's opportunity is simply by way of a

8    counterclaim for a First Amendment retaliation claim or

9    anti-SLAPP claim or the like but that Mr. McBreairty can't --

10   this is not what Ms. Hewey said, but I believe this is what

11   was sort of not so far beneath her argument -- can't engage in

12   what I'm sure the school board now is feeling is a contrived

13   effort to gain standing to come to federal court to get an

14   advisory opinion so that he can publish whatever he wants.

15        And I want you to address that specifically.

16        MR. RANDAZZA:  Your Honor, in non First Amendment

17   context, every civil litigator gets a demand letter and then

18   says, "We should file a dec action rather than wait."  Happens

19   a lot in, say, the trademark context.

20        My client -- in a case I'm handling in Florida got a

21   demand letter saying, "Stop using our trademark or else."

22        Well, of course we filed a dec action because we want

23   to continue to sell our product without worrying about it.

24        So selling dietary supplements is not less protected

25   than engaging in journalism.  So, of course, if he gets a

1    demand letter, he has a right to run into federal court and

2    seek a declaratory judgement.  He's got a concrete threat

3    here, so he should be able to do it.

4         I think their proposed alternative is very chilling

5    because all -- think about their proposed alternative.

6    Mr. McBreairty can then wait until, I guess, whatever possible

7    statute of limitations could run out, then republish?

8         But I guess then he'd be republishing it, so reset

9    the statute of limitations.

10        So he should just shut up.  He should just stop

11   publishing.  How wonderful of a tool in the hands of

12   authoritarians would this rule of law be?  Just send out

13   blanket demands to every citizen who says something you don't

14   like them saying.  Make it vague.  And then half of them are

15   going to be scared and half won't.

16        THE COURT:  Right.

17        MR. RANDAZZA:  I mean, it just -- you got more

18   freedom than that in Singapore, much less in the United

19   States.  So I cannot agree with their position.

20        The one position I could agree with is when Ms. Hewey

21   was arguing that these policies cannot apply.

22        I want a rush transcript of this to send to the Maine

23   law court before they accidentally rule against me, because

24   that's the exact opposite argument made in *Hermon* that they

25   absolutely apply.

1          So that's simply not -- I mean, that's a wonderful

2    argument.  I adopt it.  But that's not what this letter says.

3    That's not what Drummond Woodsum has said to Mr. McBreairty

4    himself in the same exact context.  So again --

5              THE COURT:  If I understand --

6              MR. RANDAZZA:  -- the chilling effect is so palpable.

7              THE COURT:  No, I understand.

8          If I understand the Brewer School Department's

9    argument, though, on that last point, I -- I think what

10   Ms. Hewey was driving at is that in the *Hermon* case, there

11   were certain of the justices who were concerned about the

12   matter of standing.

13         And I think Ms. Hewey's position on behalf of her

14   client here in this case is that they can't directly enforce

15   the school policies as it pertains to Mr. McBreairty because

16   he's not a member of the Brewer school community, however that

17   might be defined.

18             MR. RANDAZZA:  Right.

19             THE COURT:  He's not a student, certainly, and he's

20   not a staff member, so they can't directly enforce those

21   policies against him as the foundation for a basis of relief.

22   But they -- that does give the school -- according to

23   Ms. Hewey, that does give the school standing.  So that's a

24   little different, isn't it?

25             MR. RANDAZZA:  Well, in this context, no.  Because

1    here, it gives the school standing to what?  Just to then sue

2    him under these policies, which that's what we're trying to

3    enjoin.  We're absolutely trying to do that.  We're trying to

4    stop them from taking administrative, civil or criminal

5    action, all of which they threatened.

6            THE COURT:  Okay.

7            MR. RANDAZZA:  They threatened all of that.

8            Mr. McBreairty instead -- remember, it may seem --

9    you know, you read the article.  I understand they think it's

10   not polite and it's not nice.  And you know, there's a lovely

11   quote from a Florida appellate decision:  "The First Amendment

12   requires neither politeness nor fairness," *Pullum versus*

13   *Johnson*.

14           But that's true.  You may not like his article.

15   Frankly, if I were his editor, I don't like his article.

16           But that isn't the point.  That article deserves to

17   see the light of day as much as the Declaration of

18   Independence deserves to see the light of day, as much as the

19   article about the Pentagon Papers deserves to see the light of

20   day, and as much as any other article deserves to see the

21   light of day.

22           And it is right now removed from publication because

23   if he puts it back -- I mean, do they want to stand up here

24   and say, "This was just an empty threat and we're not going to

25   do anything"?  Then stipulate to the injunctive relief we're

1  seeking.

2       Mr. McBreairty deserves to go back to his editor and

3  say, "Okay.  The Court has covered me.  I'm going to have the

4  right to publish this."

5       And the public, his reading public, has a right to

6  read it and a right to receive it.

7       They do not have the power -- the government doesn't

8  have rights; it has powers.  And they do not have the power to

9  shut this journalism down because they don't like it, because

10  they don't respect it, because they don't think the picture is

11  nice.  They have nothing.  There is no power whatsoever.

12       But they are threatening to wield that power, and the

13  unlimited power of the government, to go after him.  I don't

14  think that they have that power and -- but they do.  Or at

15  least they did before we filed this.

16       THE COURT:  Mr. Randazza, I want to -- we have plenty

17  of time.  So if there's anything else you'd like to draw my

18  attention to by way of this case before we move on to the next

19  one?

20       MR. RANDAZZA:  I would.  I'd like to at least address

21  your discussion about media defendant.

22       THE COURT:  Right.

23       MR. RANDAZZA:  The media has no greater rights under

24  the First Amendment than any other common citizen, so I don't

25  think it matters.

1          I think just as a factual issue it's very clear he is

2     a media defendant.  He -- we have in the record his letter to

3     his -- or his email to his editor saying, "Do you publish

4     this?"  It's a national publication that he published it in.

5          I don't see how you can say he's not a media

6     defendant, but your decision doesn't need turn on that.  If

7     you asked me to draft a draft opinion for you, I'd probably

8     say he's a media defendant with a footnote saying it just

9     doesn't matter.  Even if it was his first foray into

10    publishing, he still has the same rights.

11         It would maybe make a difference if this went forward

12    to trial and he was seeking to invoke a shield statute.  But I

13    would encourage the Court to recognize that he is a media

14    defendant just for the purposes of if -- you know, if they

15    appeal to the First Circuit, I'd like to be able to more

16    easily get amici on board from the Maine media associations

17    and whatnot.

18         But as far as your constitutional analysis, it's no

19    different than if it was somebody putting a post-it up in a

20    bathroom, for example, like in the *Norris* case, or a

21    first-time pamphleteer.

22         THE COURT:  Anything else on this case?

23         MR. RANDAZZA:  No, your Honor.

24         THE COURT:  All right.  Do you need a drink of water?

25    Because I'm going to keep you right there for the Wells case.

1          MR. RANDAZZA:  I wouldn't mind, your Honor.

2          THE COURT:  Go ahead.

3          MS. HEWEY:  Could we take an actual --

4          THE COURT:  Do you want a break?

5          MS. HEWEY:  -- short break?

6          THE COURT:  Yeah.  Let's take 10 minutes and be back

7  at 11:40.

8          We'll be in recess.

9          THE DEPUTY COURT CLERK:  All rise.

10          (Recess is taken at 11:28 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

**C E R T I F I C A T E**

4

5

6    I, **Cathy J. Ford, CCR, CRR, RPR,** Certified Court

7   Reporter, Certified Realtime Reporter, Registered Professional

8   Reporter, and Official Court Reporter for the United States

9   District Court, District of Maine, certify that the foregoing

10  is a correct transcript from the record of proceedings in the

11  above-entitled matter.

12

13

14

15      /s/ Cathy J. Ford
        **CATHY J. FORD, CCR, CRR, RPR**
16      UNITED STATES DISTRICT COURT REPORTER
        Date: March 29, 2024
17

18

19

20

21

22

23

24

25