## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

**PATRICIA MCBREAIRTY, in her capacity as Personal Representative of the Estate of Shawn McBreairty,**

**Plaintiff,**

**v.**

**BREWER SCHOOL DEPARTMENT and GREGG PALMER,**

**Defendants.**

**No. 1:24-cv-00053-JAW**

### DEFENDANTS' TRIAL BRIEF

Defendants Gregg Palmer and the Brewer School Department submit the following trial brief pursuant to this Court's order following the final pretrial conference. *See* ECF No. 205.

### I.    STATEMENT OF THE CASE FOR TRIAL

Patricia McBreairty, as personal representative of the Estate of Shawn McBreairty, is pursuing Shawn McBreairty's action for damages under 42 U.S.C. § 1983 against Brewer School Department superintendent Gregg Palmer, alleging that Palmer acted in retaliation to violate Shawn McBreairty's First Amendment right to freedom of speech. U.S. Const. amend. I; Complaint (ECF No. 1) at Count I, including ¶ 82.[1] The case against Gregg Palmer is based upon his agreement to have the school department's lawyer send correspondence to Shawn McBreairty on February 13, 2024, addressing discrete portions of a recent article Shawn McBreairty posted

---

[1] Palmer addresses later in this Trial Brief, Count II of the Complaint, seeking damages under the Maine Civil Rights Act (Me. Rev. Stat. tit. 5, ch. 337-B) for the same alleged conduct in violation of the Maine Constitution. Count II must be treated as strictly coextensive with the section 1983 case. *See McBreairty v. Miller*, No. 1:23-cv-00143-NT, 2024 WL 2187436 at *5 (D. Me. May 15, 2024); *see also Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994) (federal qualified immunity under section 1983 equates to state qualified immunity under Maine Civil Rights Act).

on his website. The correspondence raised an issue with McBreairty's having posted a photograph of minority-aged students inside the public high school bathroom facility, under circumstances where the photograph had been unlawfully shot without the consent of the students in the photograph. Shawn McBreairty's posting of the illicit photograph caused deep turmoil within the high school, disrupting and infringing upon the educational rights of the students involved, and of teachers who must supervise them, drawing heated reactions and complaints from parents and students.

Gregg Palmer has been sued in both his individual, personal capacity and in his official capacity. Complaint (ECF No. 1) at ¶ 85. In this section 1983 action seeking *damages*, the individual/official capacity distinction carries pronounced, significant ramifications. *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985); *Goldstein v. Gavin*, 719 F.3d 16, 23 (1st Cir. 2013). The official capacity claim against Palmer is treated as a claim against Brewer School Department (in essence, the municipality of Brewer) as an entity. *Kentucky* 473 U.S. at 166 ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). "The situation is quite different when an official is sued in his individual capacity. By definition, such a suit takes aim at the individual, not the government entity with which he is associated." *Goldstein*, 719 F.3d at 23. The nuances of this important distinction in this case are discussed in Part III of this brief. Though a significant emphasis must be mentioned at the outset as we review what happened in the underlying events of this case:  There is no respondeat superior in section 1983 actions, either in individual capacity damages claims against officials employed by the entity, or with respect to official capacity claims (which are claims against the municipal entity itself). *Ashcroft v. Iqbal*, 556 U.S. 662, 675-76 (2009); *Monell v. City of New York Dept. of Social Servs.*, 436 U.S. 658, 691 (1978); *Roberston v. Sichel*, 127 U.S. 507, 515-16 (1888).  "Because

2

vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 556 at 676.

As explained further below, Gregg Palmer's liability in this case turns not on blindly imputing to him the conduct of the school's lawyer, but whether, under the doctrine of qualified immunity applicable to *individual capacity* claims, a reasonable school official facing the issue he faced would have known that writing to McBreairty about the discrete parts of his article in issue violated clearly established constitutional rights to free speech.

## II.    SIGNIFCANT FACTUAL ISSUES FOR TRIAL

On February 12, 2024, in the early afternoon on the day of a Brewer School Committee meeting scheduled for later that evening, Shawn McBreairty posted an article on his [your]NEWS website entitled "Girl's Bathrooms are Not 'Safe Spaces' When Males are Present."  McBreairty Article, Ex. A, at ECF No. 1-6. Apart from publishing his views on issues related to transgender students' use of public school bathrooms, McBreairty's article publicized an illicit photograph of Brewer High School students—who were minors—inside the school's bathroom.  *See id*.  McBreairty also singled out one of those photographed students by name, and falsely suggested that they had engaged in sexual assault.  *See id*.

Right after the article and photograph were published online, the minor student named in the article and shown in the photograph stopped attending school. The student (referred to in the Complaint in this matter as "HD") at the time had been a long-time student in Brewer and was then a senior at Brewer High School. Gregg Palmer knew the student and considered them to be a thoughtful and respectful student who had been involved in activities in the school. HD had met the legal standards under Maine law to use the girl's bathroom at the school. These legal

3

standards included the established rules on unlawful educational discrimination based on gender identity in Maine law specifically as they relate to students' rights to use of public school bathroom facilities and the related right to be assured privacy in that respect. There was no record of discipline for assault in HD's school record. When Gregg Palmer met with one of HD's peer students, HW, and her father concerning the petition to revise school policies that is referenced in the Complaint in this matter, HW expressed discomfort in sharing a restroom with HD because she believed HD to be a biological male, but she did not mention any concerns that HD had assaulted anyone.

After Shawn McBreairty's post in issue appeared online it was the subject of discussion and disruption at the High School. HD stopped coming to school. HD had planned to attend the Brewer School Committee meeting that evening on February 12th, a meeting which Shawn McBreairty did himself attend including making public comment; but HD did not attend because of fear of Shawn McBreairty. Gregg Palmer also heard complaints from the students and families of the other students depicted in the photograph in issue, who were upset about the violation of their children's privacy rights. Palmer also heard from, Michelle MacDonald, one of the teachers at the High School, who was feeling bullied by the statements Shawn McBreairty made about her child in the post. The disruption and emotional distress that the post was causing to students and a staff member, was reflected further in a communication received by Gregg Palmer during the February vacation, from HD's mother.

Gregg Palmer viewed it as his responsibility, as school superintendent, to ensure that Brewer's schools are safe places for all students and staff. He understood that he had an obligation to speak out on behalf of students and staff in situations such as this one, as an incident of what could reasonably be considered cyberbullying or an invasion of students'

educational rights and rights to privacy under the law. He involved the school's lawyer, Melissa Hewey, in the decision about how to address the posting of the illicit photograph, and agreed it was reasonable to try to get Shawn McBreairty to take these discrete portions of the post down that could reasonably be viewed as cyberbullying or invading the privacy of the students under all of the circumstances.

Attorney Hewey wrote and sent the email correspondence to Shawn McBreairty of February 13, 2024, which is at the heart of this case. *See* Complaint Exhibit 5 (ECF No. 1-5 at 2). Gregg Palmer recognized that Shawn McBreairty was entitled to express his opinion about matters involving LGBTQ rights of students, and consistent with this understanding the email correspondence did not request that McBreairty remove anything from the post except for the specific material outlined, focusing on the photograph shot inside the bathroom without the students' permission along with the identification of HD in the photograph with accusations of assault. The correspondence told McBreairty that the school recognizes his right to speech, stating "we acknowledge that much of that post contains your opinions on matters of public concern and recognize your right to express them") (ECF No. 1-5 at 2).

Shawn McBreairty then removed his entire post, rather than just the specific portions the correspondence had requested. However, it soon came to Gregg Palmer's attention that McBreairty had posted a screenshot of the very February 13, 2024 email correspondence from Attorney Hewey which had quoted the specific portions of the articles that the correspondence sought to have McBreairty address. So Melissa Hewey sent another communication to McBreairty, thanking him for removing "the image and certain content" in response to her first communication, but pointing out that by posting her first communication itself, he was effectively reposting some the same content because the first communication had quoted that

content verbatim. Complaint Exhibit 6, ECF No. 1-6.

 McBreairty responded to that request by an email of February 14, 2024 that largely speaks for itself, but that likens the request to remove the photograph to a "stick up artist put[ting] a gun to my face," and characterizing her "demand" to remove certain content as "not only ridiculous" but also "greedy."

With no further communication McBreairty commenced this case eight days later, on February 22, 2024. But it was learned that right after McBreairty removed the content from his website, two days later he made a guest appearance on the Stew Peters Show podcast, during which the same photograph of the minor students in the Brewer High School bathroom was displayed and McBreairty repeated some of his statements about the students (and the photograph was thereafter viewable online, continuously, by virtue of his appearance). It was also learned that a few days before filing this suit – and continuously thereafter – McBreairty posted the photograph on his X account. There are other important relevant public statements made by McBreairty in this timeframe, including his ongoing boast that he is "America's Most Dangerous Dad."

HD remained out of school through February 16, 2024, when February vacation started. Over February vacation, HD's parent wrote an email to Gregg Palmer stating that when HD returned to school, they intend to use a single stall bathroom. The parent explained the decision as follows:

> This is what we feel is best for our family, for their academics and for the school. Reading that article only strengthens the decision. I have many strong feelings about how this group has gone about things and how they have villainized and victimized children. They are not looking out for the greater good. However, I can not allow my childs [sic] and my family's matters to be laid out for public debate and scrutiny.

6

### III.    SIGNICANT LEGAL ISSUES FOR TRIAL

From these circumstances, Shawn McBreairty claims that Gregg Palmer, acting in

Palmer's personal capacity, violated McBreairty's constitutional right to free speech, and that the

violation caused McBreairty to suffer actual injury in the form of severe emotional distress.

Although not alleged in the Complaint, the Estate, now substituted as proper party plaintiff under

Fed. R. Civ. P. 25(a), also seeks to punish Gregg Palmer for his conduct with a punitive damages

award against him.[2]

Given the significance of the individual capacity versus official capacity distinction for

trial, we address the official-capacity (meaning, municipal-entity liability) issue first, and then

explain the qualified immunity protections that should apply to Gregg Palmer on the individual

capacity damages claim. We contend that only an individual capacity claim should be tried

before a jury in this case.

### i.    Official Capacity Claims Under 42 U.S.C. § 1983.

A threshold decision, which ought to be addressed before trial, is whether trial can

plausibly include "official capacity" claims seeking damages against the Brewer School

Department as a standalone municipal entity under section 1983. Such claims do not meet the

---

[2] This Court has limited the timeframe for the compensatory damages claim of emotional distress to between February 13, 2024 and June 3, 2024, ruling that "Plaintiff cannot use Mr. McBreairty's suicide or any prior suicidal ideation as evidence of emotional distress damages for the period between February 13, 2024 and June 3, 2024 [the date of suicide]" and excluding evidence of suicide under Fed. R. Evid. 403 on the grounds that evidence of the suicide would confuse the issues and mislead the jury. *Order on Defendants' Motion in Limine to Exclude Evidence Related to Suicide* (ECF No. 195) at 12 & 15. Furthermore, the Estate cannot be substituted to an unalleged punitive damages claim for relief. Fed. R. Civ. P. 25(a); 18-C M.R.S. 3-817 (survival of actions does not apply to "the recovery of penalties and fines under criminal statutes"); *see Duchesne v. Sugarman*, 566 F.2d 817, 821 n.2 (2d Cir. 1977) (noting that the plaintiff's "claim for punitive damages does not survive" in connection with Section 1983 action pursuant to applicable New York survival statute); *see also Light v. Town of Livermore*, No. 1:21-cv-00266-JAW 2022 WL 4016809 at *14 (D. Me. Sept. 2, 2022) (substituted personal representative of an estate is substituted to complaint allegations, which allegations must reflect estate's standing as named plaintiff).

doctrinal *Monell* standards for pursuing damages against a governmental entity under section 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 695–701 (1978). There are no allegations of the Complaint that attempt a distinction by separately alleging facts to support a municipal entity claim. A claim against Gregg Palmer in his "official capacity" does not rescue matters, because "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985).[3]

It is now axiomatic that municipal entities cannot be held vicariously liable under the doctrine of respondeat superior. *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 209 (1st Cir. 1990). *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). More is needed than a constitutional violation committed by an official. *Kentucky,* 473 U.S. at 166; *Monell v. Department of Social Services,* 436 U.S. 658, 694–701 (1978); *Rosaura Bldg. Corp. v. Mun. of Mayaguez*, 778 F.3d 55, 62 (1st Cir. 2015). "[M]unicipality liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives *by the official or officials responsible for establishing final policy with respect to the subject matter in question.*" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (emphasis added). "[L]iability may not be imposed on a municipality for a single instance of misconduct by an official *without* final policymaking authority . . ." *Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 769 (1st Cir. 2010) (italics emphasis in original).

In this case, setting aside in any event that there are no allegations of a policy or practice of Brewer School Department that denies people their First Amendment right to freedom of expression, Gregg Palmer is not a "lawmaker" (*Monell*, 436 U.S. at 694) or an official with final

---

[3] The Supreme Court noted in *Kentucky v. Graham* that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell, supra*, local government units can be sued directly for damages and injunctive or declaratory relief." *Id*. at 167 n.14.

policymaking authority in this setting. School policies are adopted by the school boards of school administrative units. *See* 20-A M.R.S. § 6554(5) ("a school board shall ensure that its policies and procedures [to address cyberbullying] are consistent with the model policy developed or revised by the commissioner [State Commissioner of Education]"); 20-A M.R.S. § 1(28) (defining "school board" as "the governing body with statutory powers and duties for a school administrative unit").[4] While it may be within his authority to agree to a letter from the school department's lawyer threatening a person with "further action" (just as, by analogy, a police officer has authority to make arrests or conduct searches and seizures), the school board is the governing body with authority to sue on behalf of the entity. There is a distinction between an official superintendent who is charged with executing the school board's policies and procedures, or exercising his duties under Maine statutes or Maine law, including making judgment calls under them as to their scope or applicability to a single set of circumstances, and the municipal body of *final policymakers* who come up with the actual policies. Furthermore, the Complaint in this case has not challenged *the constitutionality of* any of these policies or state statutes. This case is premised on a *single act* of a governmental employee, Gregg Palmer, with respect to McBreairty. "Municipal liability" claims under section 1983 should be dropped, because they do not fit this case.[5]

### ii. Individual Capacity Claim Against Gregg Palmer under 42 U.S.C. § 1983 and the Doctrine of Qualified Immunity.

---

[4] The Brewer School Department is a state-approved "school administrative unit" as a municipal school unit within the City of Brewer. 20-A M.R.S. § 1(26)(A).

[5] As argued in *Defendants' Motion in Limine to Exclude Evidence of Punitive Damages* (ECF No. 217), and as Plaintiff's response to the motion appears to concede, punitive damages are unavailable against the Brewer School Department, regardless of whether a municipal liability claim is present. *Powell v. Alexander*, 391 F.3d 1, 23 (1st Cir. 2004).

To prevail against Gregg Palmer on the First Amendment retaliation claim for damages, the Estate must prove the following elements: 1) that the speech in question was constitutionally protected; 2) that Gregg Palmer's action would deter a reasonably hardy person from exercising their First Amendment right; 3) that Shawn McBreairty's protected speech was a substantial or motivating factor in Gregg Palmer's action – in other words, that Gregg Palmer acted with retaliatory animus or would not have taken adverse action but for McBreairty's protected speech; 4) that McBreairty's protected speech was in fact chilled or intimidated by Palmer's adverse action.  On the final  element, a mere allegation of harm is not enough; a chilling effect that is speculative, indirect, or too remote cannot support a finding of a First Amendment violation. *Falmouth Sch. Dep't v. Doe ex rel. Doe*, 44 F.4th 23, 47 (1st Cir. 2022); *Bloomquist v. Albee*, 421 F.Supp.2d 162, 180 (D. Me. 2006); *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989); *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019); *Hartman v. Moore*, 547 U.S. 250, 259-60 (2006); *Manzer v. Town of Anson*, 771 F.Supp.2d 121, 131 (D. Me. 2011); *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 470-71 (2025).

Each element presents a question for the jury. In addition all of these legal issues require analysis under the umbrella of Palmer's qualified immunity defense.

### a.      Pretrial rulings denying qualified immunity do not preclude resurrecting the defense at trial.

As a threshold matter, the First Circuit has been clear that the pretrial ruling denying qualified immunity on summary judgment does not foreclose raising the defense at trial. *Miller v. Jackson*, 152 F.4th 258, 260 (1st Cir. 2025); *McKenney v. Mangino*, 873 F.3d 75, 85 (1st Cir. 2017) (a "pretrial denial of qualified immunity is but a way station in the travel of a case") (quoting *Camilo-Robles v. Hoyos*, 151 F.3d 1, 9 (1st Cir. 1998) ("When a defendant fails on a

pretrial qualified immunity claim, he nonetheless can plead qualified immunity as an affirmative defense and resurrect the claim at trial.") (bold emphasis added); *see also Berge v. School Committee of Gloucester*, 107 F.4th 33, 42 (1st Cir. 2024) (emphasizing that the pretrial qualified immunity analysis is made "though knowing that discovery or trial evidence may cast the case in a different light").

That is especially true here where the Court's rulings on summary judgment expressly took *the facts in the light most favorable to McBreairty as the non-moving party.* ECF No. 117 at 2 & 9-10 (stating facts "in the light most favorable to the Estate" and stating denial of summary judgment is based upon the Estate, as party opposing summary judgment, demonstrating "that the record contains evidence that would permit the finder of fact to resolve the material issues in her favor"). The Court did not enter summary judgment against the Defendants on Counts I and II, which it had the power to do under Fed. R. Civ. P. 56(f)(1). Nor did the Court *order* under the authority of Fed. R. Civ. P. 56(g), a fact not genuinely in dispute, "treating the fact as established in the case." The court has the power to "grant summary judgment for a nonmovant" under F.R. Civ. P. 56(f)(1), and so enter summary judgment against the moving party on liability; but the court did not do so here. Further, avoidance of qualified immunity is one of the Estate's burdens at trial. *Escalera-Salgado v. United States*, 911 F.3d 38, 41 (1st Cir. 2018) ("When a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is inapplicable.").

And indeed, the summary judgment record did not contain many of the facts that Gregg Palmer will advance at trial relevant to the factual issues underlying his qualified immunity defense. This includes a full *trial* record on the circumstances he faced and the nature of his involvement of the school's lawyer, Melissa Hewey, who has never testified in this case by

11

affidavit, deposition, or in-court hearing. The factual record must address all of the circumstances involved in Gregg Palmer's decisions in this particularized setting, including his involvement of the school's lawyer for assistance with reasonable legal determinations about the unsettled intersection between First Amendment freedom of expression and the invasion of privacy torts and laws, and the cyberbullying and educational anti-discrimination laws in Maine, which he faced as a school official in these particular circumstances. *Belsito Communications, Inc. v. Decker*, 845 F.3d 13, 24 (1st Cir. 2016); *Cox v. Hainey*, 391 F.3d 25, 34 (1st Cir. 2004) (good faith in involving counsel about the legality of his actions and informing the reasonableness of his conduct). These are considerations that should be made on a trial record, with the parties afforded the opportunity to offer a full record of evidence, when facts are not taken in the light most favorable to Shawn McBreairty.

### b. The Elements of Qualified Immunity

"The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Put one way, the First Circuit has said that qualified immunity turns not on "whether the defendant's actions actually abridged some constitutional right . . . but, rather, whether those actions were obviously inconsistent with that right." *Cox*, 391 F.3d at 31 (citations omitted). As *Cox* explains further, "[t]he qualified immunity doctrine is designed to afford officials an added measure of protection against civil liability. To achieve that goal, the doctrine eschews a line that separates the constitutional from the unconstitutional and **instead draws a line that separates unconstitutional but objectively reasonable acts from obviously unconstitutional acts.**" *Id*. (bold emphasis added). *See also Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 214 (1st Cir. 2015) (stressing that "[c]ourts penalize officers for violating 'bright

lines,' not for making 'bad guesses in gray areas' " (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992))).

Qualified immunity is a fact-specific analysis for each individual sued, focused on their own acts. *See*, *e.g.*, *Miller v. Jackson*, 152 F.4th 258, 266-72 (1ˢᵗ Cir. 2025); *Belsito*, 845 F.3d 22. The burden is on the Estate to establish the inapplicability of the defense. *Belsito*, 845 F.3d at 23. Thus, "[t]o avoid qualified immunity [McBreairty] must show that (1) [Palmer] infracted his federal rights and (2) that these rights were so clearly established that a reasonable officer should have known how they applied to the situation at hand." *Id*. (citing among others *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court may address these elements in any order of analysis. *Id*. (citing *Pearson*, 55 U.S. at 236).

For purposes of this case, it may be helpful to note that on occasion, the First Circuit has broken down the oft-stated second prong into essentially two inquiries: "This court has construed [the qualified immunity] framework to consist of three inquiries: '(i) whether the plaintiff [has] establish[ed] a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right.' " *Cox* at 29-30; *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir.2004)). As stated in *McKenney v. Mangino*, 873 F.3d 75, 81 (1ˢᵗ Cir. 2017):

> This second step [of the qualified immunity analysis] is itself divisible into two components. To begin, the plaintiff must point to "controlling authority"' or a "consensus of cases of persuasive authority" that broadcasts "a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Then, the court must evaluate "whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." These inquiries are carried out with the understanding that qualified immunity is meant to shield "all but the plainly incompetent or those who knowingly violate the law."

*Id*. (cleaned up) (citations omitted).[6]

This case raises all facets of the doctrine. In the First Circuit (as in the majority of circuits) "[t]he availability of qualified immunity after a trial is a legal question informed by the jury's findings of fact, but ultimately committed to the court's judgment." *Acevedo-Garcia v. Monroig,* 351 F.3d 547, 563 (1st Cir. 2003). Palmer will move for judgment as a matter of law before the case is submitted to the jury under Fed. R. Civ. P. 50(a), because "[q]ualified immunity . . . is a defense from suit — not just liability." *Miller*, 152 F.4th at 261. But the court could also ultimately rule on qualified immunity on a renewed motion under Fed. R. Civ. P. 50(b), informed by the jury's findings of fact. *Acevedo-Garcia*, 351 F.3d at 563.

### c. There is no violation of McBreairty's right to free speech.

The particular speech in issue is the posting of the illicit photograph. That speech can be viewed alone, or in combination (i.e., in context) with the two other parts of the article that Melissa Hewey's correspondence raised, namely calling out the transgender student in the photograph by name and making sexual assault accusations about them. On the first element of the qualified immunity analysis (and the first element of the underlying First Amendment retaliation claim) – i.e., whether there is a constitutional violation regarding the particular speech in issue – the case raises jury questions on whether the speech was protected.

The First Amendment does not protect all speech. *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 471 (2025). "From 1791 to the present, certain historic and traditional categories

---

[6] The elements of the qualified immunity analysis developed as a sequential analysis under *Saucier v. Katz,* 533 U.S. 194, 201–06 (2001), until *Pearson*, 555 U.S. at 236, receded from the *Saucier* mandate for sequential analysis, leaving it to the discretion of the courts on a case-by-case basis which of the elements to take up first. *Belsito*, 845 F.3d at 23 ( "[w]e of course may deal with these qualified-immunity steps in any order we please."); *Miller*, 152 F.4th at 261 (courts can resolve the defense under the first or second prong, as there's no "rigid order of battle").

of speech—such as obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—have been understood to fall outside the scope of the First Amendment." *Id.* (cleaned up and quoting in part *United States v. Stevens*, 559 U.S. 460, 468 (2010)). Thus, "[s]peech integral to criminal conduct is now recognized as a 'long-established category of unprotected speech'." *United States v. Sayer*, 748 F.3d 425, 433-34 (1ˢᵗ Cir. 2014). Further, speech that a jury finds constitutes the common law tort of invasion of privacy, *Nelson v. Maine Times*, 373 A.2d 1221, 1223 (Me. 1977) (adopting Restatement (Second) of Torts § 652B), is unprotected speech; or, speech that a jury finds violates the cyberbullying statute in Maine, 20-A M.R.S. § 6554 (including the prohibition against gender identity discrimination in the unlawful educational discrimination statute, 5 M.R.S. § 4602, referenced in the definition of "cyberbullying" in § 6554(2)(B)(3)), is unprotected speech. *See Free Speech Coalition*, 606 U.S. at 471. Or, the jury could find the speech in issue was unprotected under the invasion of privacy statute, 17-A M.R.S. § 511(C) – as speech that is without consent "amplifying or broadcasting of images" which "originat[ed] in [a private] place" and which "would not be ordinarily visible [] outside that place" (to be blunt, posting a photograph of unconsenting children in a bathroom).[7]

Under any such findings there is no constitutional violation.[8] Palmer reserves the right, based on presentation of the evidence under the Estate's burden, to request additional jury

---

[7] "Private places" being defined as "changing or dressing rooms, bathrooms and similar places." 17-A M.R.S. § 511(C). The consent required is the "consent of the person or persons entitled to privacy therein," i.e., the students in the photograph, not the person who shot the unconsented-to image or of anyone who later comes into possession of it. *Id*.

[8] Relevant to qualified immunity analysis – and emphasizing how the order of elements in the analysis do intertwine – on the violation of privacy statute issue, on March 7, 2024, this Court ordered the parties *to brief* the issue of whether a photograph taken of minor children by another person in violation of 17-A M.R.S. § 511 and then posted publicly, is entitled to First Amendment protection. *Order*, ECF No. 24. It appears the Court may not have ever squarely ruled on or addressed the parties' memoranda arguments. But regardless of any after-the-underlying-events ruling from this or any court on this issue, the Court's own order of March 7, 2024, is a powerful reflection that the § 511 issue at the time of Gregg Palmer's conduct was not a "clearly established" constitutional barrier under qualified immunity analysis.

instructions on common law defamation and/or false light torts, too, relating to the speech in issue. As it stands, however, regardless of these other grounds, there is a jury question on whether the speech is unprotected under the invasion of privacy tort, the invasion of privacy statute [17-A M.R.S. § 511(C)], and the cyberbullying statute in any event. It is also important to note that Estate has never challenged the constitutionality of Maine's cyberbullying statute or 17-A M.R.S. § 511 as applied to the speech in issue. Thus, if the speech in issue is found by the jury to meet the definition of cyberbullying or conduct addressed by these statutes or torts, it is not protected speech.

### d. There is no "clearly established" violation of McBreairty's right to free speech

Since a jury question is generated under any of the above "unprotected speech" grounds, a fortiori, there is no clearly established constitutional right by which to hold Gregg Palmer personally liable in damages under section 1983. "Public officials, our judicial superiors tell us, need not be legal savants to win a qualified-immunity case." *Belsito*, 845 F.3d at 23 (citing *Crawford-El v. Britton*, 523 U.S. 574, 590 (1998)). The qualified immunity doctrine shields Palmer from having to wait for a final jury determination on the issue of whether the speech in issue is an unprotected invasion privacy or cyberbullying, because, to avoid the qualified immunity doctrine, the Estate must have more than just those findings. The Estate must show that "controlling caselaw or a consensus of persuasive caselaw [] puts the constitutional question beyond debate." *Miller*, 152 F.4th at 261 (cleaned up) (citing *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63-64 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011)).

The Estate jumps to cite *Berge v. School Committee of Gloucester*, 107 F.4th 33 (1st. Cir. 2024) to point to a "clearly established" constitutional right that is beyond debate. But *Berge* does not answer the questions that Gregg Palmer was facing here. *Berge* provides us with the

16

relatively uncontroversial point that the wiretap statute that bans "secret" recordings cannot be threatened to chill speech that is not itself a wiretap violation but rather the "very publicly recorded public officials performing public duties in the publicly accessible part of a public building . . ." *Berge*, 107 F.4th at 42. The general principle from *Berge* would not apply, for example (drawing on the same paradigm of facts in *Berge*) if a person came to the school and began broadcasting child pornography in the same public spaces, or engaged in criminal threatening, or – to cut it awful close to home here – began to try to get into one of the school bathrooms to record unconsenting pictures or posted on a school lobby bulletin board illicit photographs of people inside the school bathroom. If the latter happened, would a school official violate the constitutional rights of the person who put that kind of photo up on the school bulletin board, by taking steps to remove it? Certainly, as another example, broadcasting speech that bullies a specific student by shouting unconfirmed sexual abuse allegations in the school lobby with a megaphone, raises the same questions. *Berge* does not answer these.

Maine's cyberbullying statute sets the prohibition that "[a] person may not engage in bullying on school grounds," and then goes on to expand the scope of "school grounds" to conduct that "[t]akes place elsewhere or through the use of technology [which has previously been defined in the statute to mean use of a computer or any electronic device], but only if the bullying also infringes on the rights of the student at school as set forth in subsection 2, paragraph B" of the statute. Furthermore, McBreairty's broadcast of the photograph could reasonably be viewed as a violation of the privacy laws (again, an issue that *Berge* does not help to answer clearly). Gregg Palmer's duties as superintendent also must be taken into account. He is responsible for addressing incidents of cyberbullying, discrimination, or interference with students' educational rights. Schools must provide students with bathroom facilities "[i]nstalled

so that privacy, cleanliness and supervision are assured" 20-A M.R.S. § 6501. They must comply

with *Doe v. Regional School Unit 26*, 2014 ME 11, ¶11, 86 A.3d 600, and the Maine Human

Rights Act, regulating a student's right to use the bathroom consistent with his or her gender

identity. Whether the school has "standing" to sue under the cyberbullying statute is not the

issue; the issue is whether McBreairty had a clearly established constitutional right to be free to

do what he did, to take a photograph like this and republish it on his website article. *Berge* –

which nonetheless was decided five months *after* the events of this case – does not make the

answers to these questions "obvious" or beyond debate.[9]

### e. Under all of the facts presented, a reasonable school official would not understand that approving the correspondence from the school's lawyer violated McBreairty's constitutional rights.

"Clearly established means that, at the time of the [official's] conduct, the law was

sufficiently clear that every reasonable official would understand that what [they are] doing is

unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up). "It is not

enough that the rule is suggested by then-existing precedent;" rather, the law "must be clear

enough that every reasonable official would interpret it to establish the particular rule the

plaintiff seeks to apply." *Id*. (citation omitted). "[E]xisting law must have placed the

constitutionality of the [official's] conduct beyond debate." *Id.* (citation omitted).

In addition, the "clearly established" requirement demands "that the legal principle

clearly prohibit the [official's] conduct in the particular circumstances before [them]." *Id*.  This

requires the "the clearly established right [to] be defined with specificity." *City of Escondido v.

Emmons*, 586 U.S. 38, 42 (2019).  Thus, the Supreme Court has "stressed the need to identify a

---

[9] And if anything, the law on the books from the *Berge* case at the time of these events, was the district court's decision in *Berge*, granting the school officials qualified immunity. *Berge*, 107 F.4th at 38.

case where an [official] acting under similar circumstances was held to have violated" the constitution. *Id*. (cleaned up); *accord Fagre v. Parks*, 985 F.3d 16, 24 (1st Cir. 2021). Finally, it is the Estate's burden to demonstrate that the relevant law was clearly established, and it is "a heavy burden indeed." *Estate of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) (cleaned up).

Gregg Palmer's involvement of Melissa Hewey to help him with the situation he faced involving the photograph is also a factor to be considered in whether he acted reasonably. *Belsito*, 845 F.3d at 24 (1st Cir. 2016) (quoting in part *Cox*, 391 F.3d at 34 & 35).[10] In considering this factor, it will be important to keep in mind it is Gregg Palmer's conduct that is in issue in the individual capacity claim for damages against him. Melissa Hewey's conduct is not to be imputed to him, and does not legally bind him. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") (quoting *Robertson v. Sichel,* 127 U.S. 507, 515–516 (1888) ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties.")).

A significant issue on this latter point has been the Complaint's allegations of other cyberbullying litigation that Melissa Hewey had prosecuted for a different client, the Hermon School District, against Shawn McBreairty, or other cases involving Shawn McBreairty in other

---

[10] The involvement of the school's lawyer is also a factor relevant to the First Amendment retaliation claim itself, on the element of whether after a good faith reasonable investigation, Gregg Palmer subjectively and reasonably believed that Shawn McBreairty's speech was unprotected. *Waters v. Churchill*, 511 U.S. 661 (1994); *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 31 (2nd Cir. 1996).

school districts. The *Hermon* case in particular has no relevance to Palmer's "own individual actions" because Palmer is superintendent in Brewer, not Hermon. And the Hermon School District case sets no precedent at all on the "clearly established" prong, other than perhaps in Palmer's favor: the Hermon School District prevailed in defeating McBreairty's anti-SLAPP motion to dismiss, and the matter was later dismissed on McBreairty's appeal. Thus at the time of these events, the Maine Superior Court's decision in Hermon is precedent reflecting that the cyberbullying statute stands up to anti-SLAPP motions claiming that a school's cyberbullying suit violates the First Amendment's right to petition government. All the circumstances of this case support a finding that Gregg Palmer would not have understood that his conduct violated McBreairty's rights under the First Amendment, and that the reasonableness of his conduct in this regard supports qualified immunity on the individual capacity claims, and judgment in his favor on the elements of the underlying First Amendment retaliation case.

f. **This Court should dismiss the punitive damages claims against Gregg Palmer.**

In addition to the issues generated in Defendants' motion in limine, ECF No. 217, which we will not repeat here other than to emphasize the point above that the Estate's reliance on the Hermon School District litigation has nothing at all to do with Gregg Palmer's "own individual actions" *Ashcroft,* 556 U.S. at 676, there is an additional procedural issue: the Estate as a *substituted* proper party plaintiff, cannot raise grounds for relief that the decedent never raised, and this may not be a "proper" case for punitive damages when it is questionable whether a punitive damages claim – even had it been alleged – survives Shawn McBreairty's death as a statutory "penal" claim under federal law. Fed. R. Civ. P. 25(a); 18-C M.R.S. 3-817 (survival of actions does not apply to "the recovery of penalties and fines under criminal statutes"); *see Duchesne v. Sugarman*, 566 F.2d 817, 821 n.2 (2d Cir. 1977) (noting that the plaintiff's "claim

for punitive damages does not survive" in connection with Section 1983 action pursuant to applicable New York survival statute); *see also Light v. Town of Livermore*, No. 1:21-cv-00266-JAW, 2022 WL 4016809 at *14 (D. Me. Sept. 2, 2022) (substituted personal representative of an estate is substituted to complaint allegations, which allegations must reflect estate's standing as named plaintiff). Punitive damages are not proper on this factual record in any event, even beyond these issues. *See* ECF No. 127.

### IV.    Final Pretrial Conference Order Issues [ECF No. 205]

The Court has requested  that the parties address other discrete issues in the Trial Briefs. Rather than place these issues in the supplemental Trial Brief permitted under ECF No. 205, we address them briefly here.

#### i.    Double Damages

Count I is a section 1983 claim for violation of the right of free speech under the Federal Constitution; Count II is an identically pled claim for violation of the right of free speech under the Maine Constitution and the Maine Civil Rights Act. There are no factual differences in the allegations between the two Counts. *Compare* Complaint ¶¶ 79-87 *with* ¶¶ 88-95 (ECF No. 1).

The "protections afforded speech under the Maine Constitution are coextensive to those in the U.S. Constitution" and thus do not require separate analysis. *McBreairty v. Miller*, No. 1:23-cv-00143-NT, 2024 WL 2187436 at *5 (D. Me. May 15, 2024) (citing *Cutting v. City of Portland*, No. 2:13-cv-359-GZS, 2014 WL 580155, at *4 n.3 (D. Me. Feb. 12, 2014) ("'[T]he Maine Constitution is no less restrictive than the Federal Constitution' with respect to the protections it provides for the freedom of speech." (quoting *State v. Janisczak*, 579 A.2d 736, 740 (Me. 1990))), *aff'd*, 802 F.3d 79 (1st Cir. 2015)). The test for qualified immunity for a Maine Civil Rights Act claim is coextensive with the federal qualified immunity doctrine. *Clifford v.*

21

*MaineGeneral Medical Center*, 91 A.3d 567, 583 (Me. 2014) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994)).

Gregg Palmer's proposed Special Verdict Form reflects that there is no need to confuse the jury with any distinctions that do not make a difference. Under the form we submit, there is only one nominal damages line or one compensatory damages line, so a verdict returned against Palmer is an aggregate verdict on both Counts I and II; a verdict returned in his favor is a verdict in his favor on both Counts I and II.

### ii.      Shawn McBreairty's Death

Consistent with this Court's *Order on Defendants' Motion in Limine to Exclude Evidence Related to Suicide* (ECF No. 195) at 12 & 15, Defendant proposes the following simple jury instruction:

> **You will notice that the plaintiff in this case is now Patricia McBreairty, the Personal Representative of the Estate of Shawn McBreairty. The original plaintiff, Shawn McBreairty, passed away on June 3, 2024 during the pendency of this action. Under rules that we follow in court, the Estate has been substituted as the proper party plaintiff. This change in the name of the plaintiff should not affect your consideration of the evidence. Patricia McBreairty is pursuing the same claims that Shawn McBreairty brought. Therefore, you are to consider all evidence as if Shawn McBreairty were still the plaintiff, and the Personal Representative is just standing in his place to bring these claims forward. You must not allow the fact of the substitution to influence your verdict in any way.**

### iii.      Judge Walker's May 6, 2025 Order

We strongly urge the court not to confuse the jury with instructions about prior court rulings in this case – especially in a case where qualified immunity is being tried concurrently with the other issues like whether speech was protected. "Public officials, our judicial superiors tell us, need not be legal savants to win a qualified-immunity case." *Belsito*, 845 F.3d at 23 (citing *Crawford-El v. Britton*, 523 U.S. 574, 590 (1998)). It is not relevant to the issues before

the jury what this court or any court opined *later on* about issues facing Gregg Palmer at the time. Qualified immunity protects educated guesses about the law and even "bad guesses" about it. *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 214 (1st Cir. 2015). And there is no liability under the First Amendment retaliation claim if after reasonable investigation (including involvement of a lawyer), Gregg Palmer reasonably and subjectively believed the speech in issue was unprotected, even if he later turns out to be wrong. Any instruction risks misleading the jury on issues that are not relevant to Counts I and II. In fact, during the relevant timeframe for "damages" in issue between February 13 and June 3 of 2024, the gist of what the parties had heard from the Court was i) that "the current record and briefing do not allow [the Court] to find that Plaintiff has demonstrated a likelihood of success on the merits" (*Order on Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction*, March 28, 2024, ECF No. 30), and ii) the Court's order of March 7, 2024 (ECF No. 24) ordering the parties *to brief* the issue of whether a photograph taken of minor children by another person in violation of 17-A M.R.S. § 511 and then posted publicly is entitled to First Amendment protection. *Order*, ECF No. 24. The Court's own order of March 7th is a powerful reflection that the issue was not a "clearly established" constitutional barrier under qualified immunity analysis.

In the motion in limine briefing, ECF No. 222, and in objections to the *Plaintiff's Proposed Jury Instructions*, Defendant has proposed an instruction that would treat Melissa Hewey's testimony like any other expert witness (or lay witness asked to provide opinion testimony), with the jury told it may accept it or reject the testimony, and give it as much weight as it think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case. Otherwise, telling the jury about aspects of the Court's previous ruling on summary judgment in a way that contradicts a witness's testimony,

23

risks overtly suggesting to the jury that the witness is wrong or a bad lawyer, on issues that are

not relevant to the jury, and risks the caution that courts "must remain constantly vigilant to

ensure they do not infringe upon the province of the jury by commenting or appearing

to comment (positively or negatively) on a witness's credibility." *U.S. v. Ayala-Vazquez*, 751 F.3d

1, 28 (1st Cir. 2014).

Dated: March 2, 2026

Norman, Hanson & DeTroy, LLC
220 Middle Street, P.O. Box 4600
Portland, ME 04112-4600
(207) 774-7000

*/s/ Russell B. Pierce, Jr., Esq.*
Russell B. Pierce, Jr. – Bar No. 7322
rpierce@nhdlaw.com

Jonathan W. Brogan – Bar No. 3163
jbrogan@nhdlaw.com

Cecilia J. Shields-Auble – Bar No. 010696
cshields-auble@nhdlaw.com

Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 772-1941

Kasia S. Park, Esq.
kpark@dwmlaw.com

*Attorneys for Defendants Gregg Palmer
and Brewer School Department*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2026, I electronically filed the foregoing Defendants' Trial

Brief with the Clerk of Court using the CM/ECF system, which will also notify counsel of record

of the filing.

Dated:        March 2, 2026

*/s/ Russell B. Pierce, Jr., Esq.*
Russell B. Pierce, Jr. – Bar No. 7322